# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| FERMIN COLINDRES, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-4319 |
| | § | consolidated with H-01-4323 |
| QUIETFLEX  MANUFACTURING, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Plaintiffs, seventy-eight Latino employees and former employees of QuietFlex, assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203, *et seq.*[1]  Defendants argue that none of the plaintiffs has specific evidence to show that he was not properly compensated under the FLSA.  (Docket Entry No. 218 at 46).  Defendants move for partial summary judgment dismissing the FLSA claims asserted by the seventy-eight individual

---

[1]  The plaintiffs are Juan Mondragon, Jose Fuentes, Marco Mondragon, Rodrigo Santillan, Wenceslao Garcia, Abel Flores, Garcia Diaz, Blas Vasquez, Jose Luis Sanchez, Juan Sanchez, Guadalupe Mondragon, Dora Luz Hernandez, Ector Lopez, Lazaro Garcia, Fernando Gonzalez, Jose Aleman, Federico Diaz, Wilion Sosa, Esteban Estrada, Jose B. Perez, Pedro Borja, Cesar Vela, Victor Garcia Moreno, Manuel Bautista, Jaime Castro, Eliseo Rosales, Joaquin Ramos, Jesus Villegas, Alejandro Vela, Pedro Garcia Chavez, Angel Rosales, Raumir Jacome, Crescencio Martinez, Jose Gonzalez, Luz Sifuentes, Francisco Moreno, Victorio Rios, Filadelfo Santillan, Reynaldo Sanchez, Abel Ancelmo, Hector Estrada, Jorge Gonzalez, Perfecto Rosas, Alejandro Giles Baltazar, Jose Sazo, Benito Dominguez, Jose Giles Baltazar, Gelacios Cuevas, Lorenzo Pastrana, Martin Montenegro, Benito Palacios, Carlos Quintor, Mario Delgado, Eleno Garcia, Jaime Roque Delgado, Miguel Hernandez, Hector Umanzor, Adrian Rodriguez, Manuel Marquez, Ciro Dominguez, Eduardo Gonzalez, Efrain Lezama, Mario Luna, Reynaldo Montiel Ortiz, Jose Marquez, Lidio Delgado, Marco Antonio Careaga, Bernado Rosales, Federico Sandoval, Francisco Perez, Juan Casanova, Fermin Colindres, Moises Hernandez, Primitivo Mondragon, Ruben Arroyo, Jose Martin Garcia, Pedro Santillan, and Jose Santillan.

plaintiffs.[2]  These plaintiffs have responded and cross-moved for partial summary judgment that they were deprived of overtime compensation in violation of the FLSA because defendants failed to pay them for the time they actually worked, failed to pay them correctly for the overtime hours worked, and failed to compensate them for nonproduction work. (Docket Entry No. 232 at 5).  Plaintiffs have also moved to exclude defendants' expert report on defendants' compliance with the FLSA.  (Docket Entry No. 246).

Based on the motions, responses, and replies, the parties' submissions, and the applicable law, this court grants in part and denies in part plaintiffs' motion to exclude the expert report of Raymond Cordelli; denies defendants' motions for partial summary judgment, and denies plaintiffs' cross-motions for partial summary judgment.  The reasons for these decisions are explained below.

## I.    Background

Plaintiffs alleged that they regularly worked 15 to 20 minutes before their work shifts began and 15 to 20 minutes after their shifts ended and for all or part of their lunch periods, but were compensated only for their scheduled shift time.  (Docket Entry No. 289 at 4–5). The plaintiffs also alleged that until January 2000, they were required to perform menial tasks, such as cleaning the lunchroom and bathroom, without compensation.  (Docket Entry No. 55 ¶ 49).  They allege that they were required to clean their department area once a

---

[2]  Defendants moved for leave to exceed the page limit with their motion and brief.  (Docket Entry No. 217).  The number of plaintiffs and issues in this case justify such an allowance.  Defendants' motion is granted.  Plaintiffs also moved for leave to exceed the page limit with their reply to defendants' response. (Docket Entry No. 277).  Plaintiffs' motion for leave is granted.

week, a task that typically took 90 minutes or more, but were paid only an hour for the task and were required to clean their own work areas daily, without compensation.  (*Id.* ¶¶ 51–52).  Both sides have moved for summary judgment.[3]

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir.

---

[3]  Plaintiffs have moved for leave to file a motion seeking to proceed as a collective action under 29 U.S.C. § 216(b) of the FLSA and have filed the motion for certification.  (Docket Entry No.287, 288).  The defendants filed a motion to dismiss plaintiffs' motion for collective action as moot and in the alternative to extend defendants' response date.  (Docket Entry no. 293).  This court grants the motion for leave to file the certification motion and denies defendants' motion to dismiss, but also grants defendants an extension of time to respond.  The response is due on May 12, 2006.

2005).  "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.    The Fair Labor Standards Act

4

The Fair Labor Standards Act (FLSA) requires employers to compensate employees who work more than forty hours in a workweek.  It provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  The FLSA requires employers who pay piece rates to pay overtime:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection–
>
> > (1)  in the case of an employee employed at piece rates, is computed at piece rates not less than one and one-half times the bona fide piece rates applicable to the same work when performed during nonovertime hours; or
> >
> > (2)  in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours.

*Id.* § 207(g)(1)–(2).  "'An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work

without proper compensation, even if the employee does not make a claim for the overtime compensation.'"  *Harvill v. Westward Comm'cns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (quoting *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995)).

An employer must compensate an employee for all "principal activities" performed during the day.  29 U.S.C. § 254(a)(2) (2000).  In *Dunlop v. City Electric, Inc.*, 527 F.2d 394 (5th Cir. 1976), the Fifth Circuit held that activities performed by electricians before their 8:00 a.m. start time, such as filling out daily time, material, and requisition sheets, checking job locations for the day, and preparing for that day's job, were compensable "principal activities."  *Id.* at 401.  *Dunlop* defines compensable principal activities as those that are "performed as part of the regular work of the employees in the ordinary course of business" and "performed at the employer's behest and for the benefit of the business."  *Id.*  "The only activities excluded from FLSA coverage are those undertaken for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer."  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 750 F.2d 47, 50 (8th Cir. 1984); *see also Dunlop*, 527 F.2d at 398.

The FLSA also requires an employer to compensate employees for nonproductive hours under some circumstances.  29 C.F.R. § 778.318(a).  The FLSA provides:

> The situation [in which nonproductive hours must be separately compensated] is to be distinguished from one in which such nonproductive hours are properly counted as working time but no special hourly rate is assigned to such hours because it is understood by the parties that the other compensation received by the employee is intended to cover pay for such hours.  For example, while it is not proper for an employer to agree with his

6

pieceworkers that the hours spent in down-time (waiting for work) will not be paid for or will be neither paid for nor counted, it is permissible for the parties to agree that the pay the employees will earn at piece rates is intended to compensate them for all hours worked, the productive as well as the nonproductive hours.  If this is the agreement of the parties, the regular rate of the pieceworker will be the rate determined by dividing the total piecework earnings by the total hours worked (both productive and nonproductive) in the workweek.  Extra compensation (one-half the rate as so determined) would, of course, be due for each hour worked in excess of the applicable maximum hours standard.

*Id.* § 778.318(c).

QuietFlex schedules its employees to work one of three eight-hour shifts.  During most of the relevant period, "the first shift in Department [911] was from 7 a.m. to 3 p.m.; the second shift was from 3 p.m. to 11 p.m.; and the third shift was from 11 p.m. to 7 a.m." (Docket Entry No. 256, Ex. 1 ¶ 6).  Employees "clock in" when they arrive at the QuietFlex plant and "clock out" when they leave, but defendants only pay for the designated shift time. (Docket Entry No. 256 at 4).  Plaintiffs' time records show plaintiffs' "actual" time—which corresponds to the time between an employee's "clocking in" and "clocking out"—and "round" time—the time for which QuietFlex compensated the employee, typically equal to that employee's scheduled shift.  (Docket Entry No. 232, Ex. B).  QuietFlex automatically deducts 30 minutes from the 8-hour shift for each employee's lunch break.  (Docket Entry No. 256 at 4).  An employee is compensated for a day of 7.5 hours.  Defendants argue that if a nonexempt employee actually works more than 7.5 hours in a day, a supervisor will adjust the time records to reflect that.  (*Id.*).  Plaintiffs respond that the records do not reflect

7

such adjustments.

Plaintiffs assert that they often worked through part of their lunch breaks, even though QuietFlex automatically deducted a full thirty minutes from each employee's compensated day for lunch. (Docket Entry No. 276 at 3). Plaintiffs also assert that they start working as soon as they "clocked in" rather than waiting for their shift time to start. (Docket Entry No. 232 at 7). Plaintiffs assert that in the fifteen to thirty minutes after they clocked in and before their shifts started, they clean their work areas and prepare their machines. (*Id.*). Plaintiffs argue that this fifteen to thirty minutes a day, plus the time spent working during lunch, represents work for which they were not compensated, causing them to work more then forty hours a week without receiving overtime pay. Plaintiffs also assert that when they were required to work more than forty hours in a work week, they were not compensated at overtime rates.[4]

### A.    Defendants' Motions

Defendants move for summary judgment on all the FLSA claims of all of the plaintiffs. Defendants generally dispute the factual basis for plaintiffs' FLSA claims. Santiago Rodriguez, the Department 911 superintendent, testified that workers are not allowed to work during their lunch break and that, to his knowledge, "since August of 2000, no Department [911] of Shipping Department employee has worked during the lunch break."

---

[4] Plaintiffs do not clarify the period for which they seek unpaid overtime compensation under the FLSA. The statute of limitations for unpaid overtime claims is two years or three years for willful violations. 29 U.S.C. § 255(a). Five plaintiffs filed suit on October 10, 2001. They cannot seek compensation for work performed before October 10, 1998. The other plaintiffs filed suit on December 13, 2001. They cannot seek compensation for work performed before December 13, 1998.

(Docket Entry No. 256, Ex. 1¶ 9).  Defendants argue that even if some employees sometimes worked during part of their lunch breaks, they still did not work more than forty hours a week because the typical scheduled work week was only 37.5 hours.  (Docket Entry No. 256 at 10).  Defendants argue that, although employees "clock in" before the start of their shift, they do not do compensable work during that time.  (*Id.*).  Santiago Rodriguez testified that since "2001, when the automated method for clocking in and out was introduce, employees have been prohibited from clocking in more than fifteen minutes before their shift begins.  (Docket Entry No. 256, Ex. 1 ¶ 7).  Rodriguez also testified that employees cannot work before or after their scheduled shifts because they must coordinate their work with other employees.

> Workers are not allowed to perform work before the beginning of their shift or after the end of their shift unless they have permission to do so (the handbook specifies that all overtime must be pre-approved).  Moreover, it is not possible for two workers to operate the same machines in Department [911], bag the same duct in Department [911], or drive the same forklift in either Department [911] or the Shipping Department at the same time.  It is also impossible for one worker to prepare a machine before the shift begins while another operator whose shift is ending is operating a machine, or straightens his area near the end of the shift.

(*Id.* ¶ 9).  William Daniel, Jr. testified that, if an employee works more than 7.5 hours in a day, supervisors change employees' time cards to reflect that.  (Docket Entry No. 256, Ex. 1 ¶ 4).  Daniel also testified that employees are prohibited from working during lunch and are now prohibited from clocking in more than 15 minutes before the beginning of their shift.  (*Id.* ¶¶ 6–7).  Daniel testified that employees were, on occasion, asked to perform work other than making their pieces and that they were paid an hourly rate for this work or, "for smaller

tasks (such as straightening their work area in the last few minutes of their shift), they were told that their piece rate pay includes this type of work."  (*Id.* ¶ 9).

Defendants group the plaintiffs into four categories for the purpose of the summary judgment motion:  (1) plaintiffs who either testified that they did not work more than forty hours in a workweek, or who testified that they cannot recall working more than forty hours in a workweek; (2) plaintiffs who testified that they did occasionally work more than forty hours in a workweek but said that they received overtime payment on those occasions; (3) plaintiffs who testified that they did receive overtime payments but are either uncertain whether those payments were correct or who cannot remember whether they received overtime payments; and (4) plaintiffs who allege that they did not receive overtime payment for working more than forty hours in a workweek but who cannot identify any particular occasion when they allegedly worked overtime and were improperly paid.  The record as to each of these categories is examined below.

>    1.    *Plaintiffs Who Testified That They Did Not or Cannot Recall Working More than Forty Hours in a Workweek*

Defendants argue that many plaintiffs testified in their depositions that they did not work more than forty hours a week while employed by QuietFlex or that they cannot remember whether they worked more than forty hours a week while employed by QuietFlex. Defendants place Juan Mondragon, Jose Fuentes, Marco Mondragon, Rodrigo Santillan, and Wenceslao Garcia in this category.  (Docket Entry No. 218 at 4–6).  Defendants provide excerpts of these defendants' deposition testimony to show that they cannot establish

working more than forty hours in a week.  For example, Juan Mondragon testified as follows:

Q.      Mr. Mondragon, did you typically clock in on your shift before you began your work?

A.      Whenever we entered the work area, we had to clock in.  We couldn't go in without clocking in.

Q.      So, you never began work without clocking in; is that right?

A.      No, I didn't.

Q.      Okay.  Did you ever work after you had clocked out?

A.      No.  No, I don't remember.  No, I never worked like that.

Q.      Did you get a lunch break?

A.      No – oh, yes.  To go eat?  Yes.

Q.      How long was your lunch break?

A.      Well, the time, we would make that ourselves, because we had to eat very fast because we were working on production.

. . . .

Q.      Okay.  Did you ever work more than 40 hours a week?

A.      No.

Q.      Did you ever believe that you were paid incorrectly for a week's work?

A.      Well, no.  Because the ones that were working production would count the pieces, production pieces, that we had done; and that was what it would come out to.

. . . .

Q.      How many weeks did you work over 40 hours when you were in the shipping department in that month and a half?

A.      I don't remember.

11

Q.     More than one week?

A.     Yes.

Q.     More than three weeks?

A.     I don't know.  I don't remember.

Q.     Did you receive extra pay for the overtime that you worked?

A.     Yes.

(Docket Entry No. 218, Ex. 4 at 21, 31, 59).

Defendants argue that Marco Mondragon, Rodrigo Santillan, and Wenceslao Garcia testified that they did not remember working more than forty hours in a week or could not testify as to a particular occasion when they worked more than forty hours in a week.  Marco Mondragon testified that he "supposedly" worked 40 hours but that he "never counted the hours."  (Docket Entry No. 218, Ex. 6 at 21).  Rodrigo Santillan, who worked at QuietFlex on multiple occasions, testified that he didn't remember whether he ever worked more than forty hours in a week during his first two years at QuietFlex or whether QuietFlex paid him overtime.  (*Id.*, Ex. 7 at 26).  Santillan also testified that, during the third period  he worked at QuietFlex, he did work overtime and QuietFlex paid him for that overtime.  (*Id.* at 68).  Wenceslao Garcia similarly testified that he did not remember whether he worked more than forty hours in a week, but on multiple occasions felt that his paycheck did not represent the hours that he worked.  (*Id.*, Ex. 8 at 28).

These plaintiffs submitted declarations that they regularly worked before their shifts started, after clocking in and during their lunch breaks.  Mondragon stated that he "[does] not

12

know whether QuietFlex paid [him] properly for the overtime hours [he] worked there. [He] punched in up to 30 minutes early before [his] shift to begin working almost everyday and QuietFlex never counted that time on [his] paycheck."  (Docket Entry No. 232, Ex. C-36). He stated that "QuietFlex always took 30 minutes out of [his] paycheck for lunch everyday, even on days when [he] did not take a lunch or took just a few minutes for lunch when [they] were behind in production."  (*Id.*).  Rodrigo Santillan declared that he "usually went in to work about 30 minutes before [his] shift was supposed to start so that [he] could set up and start working" and that he did not believe that QuietFlex included this time in his pay. (Docket Entry No. 232, Ex. C-56).  Wenceslao Garcia similarly declared that "QuietFlex always took 30 minutes out of [his] paycheck for lunch everyday, even on days when [he] did not take a lunch or took a much shorter lunch" and that he "punched in up to 30 minutes early before [his] shift almost everyday to start working and QuietFlex never counted that time on [his] paycheck."  (*Id.*, Ex. C-22).

Conflicts between deposition testimony and subsequent affidavits or declarations are resolved in favor of the deposition testimony unless the conflict is explained.  *Valleza v. City of Laredo, Tex.*, 331 F. Supp. 2d 579, 582–83 (S.D. Tex. 2004) (quoting *S.W.S. Erectors v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("[T]his court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.")).  Plaintiffs explain the conflicts between their depositions and declarations.  Plaintiffs note that given the complexity of overtime compensation, they could not be expected to "expound readily at deposition upon each time they did or did not earn

overtime, how much each is due in overtime compensation, and the correct manner in which to calculate overtime under federal law." (Docket Entry No. 232 at 14).  The plaintiffs' own depositions often show that they often did not understand the questions about overtime compensation.  Defendants assert that Mondragon "testified that he had never worked more than 40 hours in a week," (Docket Entry No. 218 at 4), but Mondragon testified in the same deposition that he worked more than forty hours a week while in the shipping department.[5] Dominguez testified that he was "almost illiterate" and unable to "make calculations" regarding overtime pay" (Docket Entry No. 218, Ex. 64); Luna testified that he did not know how his pay was calculated when he worked more than 40 hours in a week (*id*., Ex. 67); Ortiz testified that he "never knew" how his overtime was calculated and didn't "think that anybody every [sic] knew how that time was paid," (*id*., Ex. 68); Marquez testified that "I couldn't tell you [how much QuietFlex owes me in overtime pay].  How could I tell you that if I don't know, if I don't know how they paid me for overtime and all that?" (*id*., Ex. 69). Some of the plaintiffs worked at QuietFlex for years or at different times, increasing the difficulty of specifying when they worked overtime but were not paid overtime rates.

The confusion over the questions is apparent in the depositions.  As noted, Mondragon testified both that he never worked more than forty hours and that he worked more than forty hours more than once.  (Docket Entry No. 218, Ex. 4 at 21, 31, 59).  Mondragon's answer to defendants' questions about whether Mondragon believed he was paid correctly

---

[5]  Defendants acknowledge this conflicting deposition testimony in a footnote but do not explain it or its effect on their argument.  (*See* Docket Entry No. 218 at 5 n.7).

14

demonstrates his confusion as to calculating overtime.  Defendants quote Mondragon's testimony as follows:

Q.     Okay.  Did you ever work more than 40 hours a week?

A.     No.

Q.     Did you ever believe that you were paid incorrectly for a week's work?

A.     Well, no.

(Docket Entry No. 218 at 5).  Defendants omit the rest of Mondragon's answer to the last question.  Mondragon's answer to the question whether he believed he was paid incorrectly was, "Well, no.  Because the ones that were working production would count the pieces, production pieces, that we had done; and that was what it would come out to."  (Docket Entry No. 218, Ex. 4).  Mondragon referred to the piece rate system, rather than the number of hours that he worked.  The FLSA does not exempt piece rate pay from overtime pay requirements.  29 U.S.C. § 207(g)(1)–(2).

In addition, the summary judgment record includes payroll records that in some cases show that plaintiffs worked overtime, despite their deposition testimony that they did not or cannot recall doing do.  Defendants' own payroll records show that Mondragon worked overtime hours for which he was paid at overtime rates during twenty-six weeks between January 1998 and December 2000, providing further evidence that confusion rather than mendacity explains the difference between his deposition and declaration.  (Docket Entry No. 256, Ex. 41).

If, as plaintiffs allege, defendants counted only "shift time" in calculating pay,

15

Mondragon and other plaintiffs may not have considered the time spent working before their shifts and during their lunch breaks as "work" to be included in calculating the number of hours worked in a given work week.  Any such misunderstanding does not affect the FLSA's requirement that employers include such time in calculating overtime obligations.  Plaintiffs have adequately explained the differences between the declarations and the depositions with respect to awareness of working overtime hours without receiving overtime compensation. This court will not disregard the declarations in analyzing the summary judgment evidence. Those declarations, with the payroll records and other summary judgment evidence, create disputed fact issues that preclude summary judgment.

> 2.    *Plaintiffs Who Testified That They Were Paid Overtime or That They Are Not Raising an FLSA Claim*

Defendants argue that many plaintiffs testified that they were paid overtime or that they are not raising overtime claims.  Defendants place Abel Flores, Garcia Diaz, Blas Vasquez, Jose Luis Sanchez, Juan Sanchez, Guadalupe Mondragon, Dora Luz Hernandez, Ector Lopez, Lazaro Garcia, Fernando Gonzalez, Jose Aleman, Federico Diaz, Wilion Sosa, Esteban Estrada, Jose B. Perez, and Pedro Borja in this category.  (Docket Entry No. 218 at 7–13).  Defendants assert that plaintiffs' deposition testimony shows that they were paid for overtime hours that they worked or that plaintiffs understand their claims as one for unpaid "nonproductive work," which defendants argue is outside the FLSA.

For example, Abel Flores testified as follows:

Q.    Okay.  And did it also – did your paycheck stub also reflect the occasions on which you worked overtime during the week?

16

A.    On occasions, when overtime was worked.

Q.    I mean, does it sound right to you that you worked overtime a handful of times during your employment with the company?

      MS. SIMONS:  Objection

A.    Yes, just certain times, not all the time.

Q.    And whenever you worked overtime while you were working at the company, were you paid for your overtime?

      MS. SIMONS:  Objection, calls for a legal conclusion.

A.    Yes.

Q.    And, in those instances, the overtime rate was one and a half times your regular rate, correct?

A.    Well, I can't – I mean, I don't remember.

Q.    Okay.  Are you saying you don't know how the company calculated your overtime rate?

A.    Well, I remember that it would be calculated upon the amount of work that you did on a regular – on regular days.

Q.    All right.  Are you claiming in this lawsuit that the company did not pay you overtime when they should have?

      MS. SIMONS:  Objection.

A.    Well, no, not in what refers to the work itself.  What we are claiming is for the time that we wouldn't get paid for when we had to do the cleaning of the bathrooms and the work area.

      MR. OBERTI:  Objection, nonresponsive.

Q.    Okay.  I just want to know: Are you claiming that the company owes you overtime payments?

MS. SIMONS: Objection.  Same objection.

A.      I cannot explain it.

Q.      Cannot explain what?

A.      Well, I don't remember.  Well, I don't remember having made a claim
        for overtime.

(Docket Entry No. 218, Ex. 9 at 27–28).

Defendants argue that this testimony shows that Flores is complaining about nonproduction work and that he was paid the overtime that he was due.  (Docket Entry No. 218 at 7).  Flores is one of the eighteen plaintiffs who did not file a separate declaration.  In his deposition, he testified that he sought overtime compensation for "the time that [plaintiffs] wouldn't get paid for when [they] had to do the cleaning of the bathrooms and the work area."  (*Id.*).  Plaintiffs have argued that they cleaned their work areas after they clocked in and before their shift time began.  Flores testified that he received overtime pay when he "worked overtime," but his testimony shows that he did not, at the deposition, include the time spent cleaning his work area as time that should be counted in calculating overtime pay.  (*Id.*).  *See Dunlop*, 527 F.2d 394 (holding that activities performed in preparing for the day's work are compensable under the FLSA).

Defendants cite similar testimony by other plaintiffs.  Jose Luis Sanchez testified:

Q.      When you worked in Department 911, how many hours did you work?

A.      40.

Q.      Did you ever work more than 40 hours a week in 911?

18

A.      Yes.

Q.      How often?

A.      Sometimes once a month, sometimes three weeks.

Q.      And when you worked more than 40 hours a week, were you paid overtime?

A.      Yes.

(Docket Entry No. 256, Ex. 56 at 16).  Defendants do not cite the next part of Sanchez's testimony:

Q.      Did you ever complain about the amount of a paycheck that you received, to your manager?

MS. CONNERTY:  Objection, form.

MR. BOWNE:  Same objection, ambiguous.

A.      Yes.

Q.      Do you remember when that happened?

A.      No.

Q.      How many times did that happen?

A.      I don't remember.

Q.      More than once?

A.      Yes.

Q.      More than five times?

A.      Yes.

(*Id.*).  Sanchez also filed a declaration in which he stated that "[t]here were many times when

19

[he] would punch in up to 30 minutes early to work and change the pieces on the machines and QuietFlex did not count that time on [his] paycheck." (Docket Entry No. 232, Ex. C-52). He further stated that "QuietFlex would always take out 30 minutes for lunch everyday even when [he] took only a 15 or 20 minute lunch." (*Id.*).

Jose Aleman testified in his deposition that, although he sometimes worked more than forty hours a week, he was paid overtime. He testified as follows:

> Q.    Did you ever work more than 40 hours a week, between 1996 and 2001, when you were in Department 911?
>
> A.    Yes, we would work like that, not all the time, but we did do it sometimes.
>
> Q.    Did you get paid overtime when you worked more than 40 hours a week?
>
> A.    Yes, they did pay me that.
>
> Q.    Did you receive a paycheck every week?
>
> A.    Yes, a check.
>
> Q.    Did you ever look at your paycheck and believe that you had not been paid the correct amount for that week?
>
> A.    No.  I was always paid the right amount.

(Docket Entry No. 256, Ex. 7 at 33–34).  Aleman stated in his declaration, however, that he "had to come in about 15 to 20 minutes before the start of [his] shift to clean and prepare [his] area for production" and that he "was not paid correctly for this time."  (Docket Entry No. 232, Ex. C-1).  This apparent contradiction is explained and does not require this court to disregard the declaration.

That defendants paid individual plaintiffs overtime rates for some overtime work does not warrant summary judgment against plaintiffs' claims that they were not paid for overtime accrued by working during lunch or before the start of their shifts. The summary judgment record reveals disputed issues material to determining whether defendants paid plaintiffs for time worked during their lunch breaks or before their shifts, even for those plaintiffs who testified that they received some overtime payments.

> 3.   *Plaintiffs Who Testified That They Cannot Identify Whether They Were Entitled to Overtime Pay or Whether or How They Were Paid Overtime*

Defendants argue that many plaintiffs were unable to testify as to whether they deserved overtime or, if so, whether they received it. Defendants place Cesar Vela, Victor Garcia Moreno, Manuel Bautista, Jaime Castro, Eliseo Rosales, Joaquin Ramos, Jesus Villegas, Alejandro Vela, Pedro Garcia Chavez, Angel Rosales, Raumir Jacome, Crescencio Martinez, Jose Gonzalez, Luz Sifuentes, Francisco Moreno, Victorio Rios, Filadelfo Santillan, Reynaldo Sanchez, Abel Ancelmo, Hector Estrada, Jorge Gonzalez, Perfecto Rosas, Alejandro Giles Baltazar, Jose Sazo, and Benito Dominguez in this category (Docket Entry No. 218 at 13–28). Defendants provide excerpts from these plaintiffs' deposition testimony to show that they were uncertain as to whether they deserve overtime pay or were paid for overtime hours that they worked.

For example, Cesar Vela testified at his deposition as follows:

Q.   Do you remember if there ever came a time when you worked more than 40 hours a week at QuietFlex?

A.   Are you asking me if I remember how many times I had to work longer

from the moment that I started until now?

Q.     I'm just asking you if you ever had to work more than 40 hours a week
       at QuietFlex?

A.     Yes.

Q.     Do you know, on those occasions when you worked more than 40 hours
       a week, whether you received overtime?

MR. HINOJOSA:  Objection, form.

A.     No, I don't remember.

Q.     Are you making any claim here today that there was a week or more
       than one week when you did work more than 40 hours but you did not
       receive overtime?

MR. HINOJOSA:  Objection, form.

A.     No, I don't remember.

(Docket Entry No. 256, Ex. 64 at 22).  Vela stated in a declaration that he "punched in about
15 minutes early to clean and begin work, almost everyday, and QuietFlex never counted that
time on [his] paycheck."  (Docket Entry No. 232, Ex. C-59).  Vela further stated that his
"lunches were usually short, about 15 to 20 minutes, but QuietFlex would always take out
30 minutes for lunch everyday."  (*Id.*).

Victor Garcia Moreno testified at his deposition that he did not pay attention to how
QuietFlex paid his overtime:

Q.     Did you ever work more than 40 hours in a workweek?

A.     Yes.

Q.     Okay.  And did the company pay you time and a half for any hours over

22

> 40 that you worked in a workweek?
>
> MR. HINOJOSA:  Objection, form.
>
> A.   Well, I really didn't pay that much attention to that; but I didn't know how much they were paying me for overtime.
>
> Q.   And did you know how they were calculating any overtime payments that they made to you?
>
> A.   No.
>
> Q.   I imagine that you never made any complaints about overtime to the company, did you?
>
> A.   No, I didn't pay attention to how they paid overtime.

(Docket Entry No. 256, Ex. 28 at 87–88).  Moreno filed a declaration in which he stated that, "[a]lmost everyday, [he] arrived about 10 to 15 minutes early for [his] shift to clean and start work and QuietFlex did not count that time on [his] paycheck."  (Docket Entry No. 232, Ex. C-21).  He stated that he "regularly took 20 minutes for lunch or [he] would not take a lunch, but QuietFlex would always take out 30 minutes for lunch everyday."  (*Id.*).

These inconsistencies are similar to those already discussed.  The confusion behind plaintiffs' deposition answers is best demonstrated by defendants' own pay records, which show that Vela and Garcia Moreno both received overtime pay on multiple occasions, despite their inability to recall it during their depositions.  (Docket Entry No. 256, Exs. 28, 64).

Defendants argue that Vela, Garcia Moreno, and other plaintiffs who were unable to pinpoint in their depositions the overtime payments they are seeking cannot make a *prima facie* FLSA claim.  Defendants cite two cases in support of this argument, *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986); *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  These cases hold that the nonmoving party must make a showing sufficient to establish the existence of each element essential to  the party's *prima facie* case and cannot withstand a summary judgment motion with "conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Reaves Brokerage*, 336 F.3d at 412; *see also Celotex*, 477 U.S. at 322–23.

An employee bringing an FLSA action based on unpaid overtime compensation must show that he performed work for which he was not properly compensated.  *Harvill*, 433 F.3d at 411 (citing *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946)).  "When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records."  *Anderson*, 328 U.S. at 687.  When the records are inadequate, an employee may meet his burden with other evidence. *Id.*  When an employer's records are "inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises.  The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work . . . . In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produced sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.* at 687–88.  If the employee meets his burden, the "burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the

reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may only be approximate." *Harvill*, 433 F.3d at 441.

Plaintiffs' uncertainty in their depositions as to whether they worked "overtime" or were properly paid for overtime they worked does not warrant summary judgment for the defendants.  Plaintiffs present competent summary judgment evidence that the "actual time" shown in defendants' time records, which represents the time they clocked in and out, better represents the time they worked than does the scheduled shift time for which they were paid. Summary judgment is not warranted.

4.  *Plaintiffs Who Allege That They Were Not Paid Overtime but Who Cannot Provide Definite Testimony about Their Allegations*

Defendants group Jose Giles Baltazar, Gelacios Cuevas, Lorenzo Pastrana, Martin Montenegro, Benito Palacios, Carlos Quintor, Mario Delgado, Eleno Garcia, Jaime Roque Delgado, Miguel Hernandez, Hector Umanzor, Adrian Rodriguez, Manuel Marquez, Ciro Dominguez, Eduardo Gonzalez, Efrain Lezama, Mario Luna, Reynaldo Montiel Ortiz, Jose Marquez, Lidio Delgado, Marco Antonio Careaga, Bernado Rosales, Federico Sandoval, and Francisco Perez in this category.  (Docket Entry No. 218 at 28–43).  Defendants argue that these plaintiffs, despite testifying that they were not properly paid for overtime they worked, fail to allege with specificity the weeks during which they worked overtime and were not properly paid.

For example, Jose Giles Baltazar testified as follows:

25

Q.      In 1999, how many weeks did you work more than 40 hours in a week?

A.      Well, I couldn't tell you because I don't remember.

Q.      How often in 1999 did you work more than 40 hours a week?

A.      If it happened frequently?

Q.      Yes.

A.      Well, sometimes, there were months we would work more than 40 hours; and I couldn't tell you exactly how many.

Q.      Tell me roughly how many weeks in 1999 you worked more than 40 hours in a particular week.

A.      How many times did I work more than 40 hours a week?  What do you mean?  Could you explain that again?

Q.      How many hours a week did you work, typically?

A.      40, sometimes 50.

Q.      How often did you work more than 40?

A.      Well, when there was a lot of work there, sometimes we would work, like, half a year, on Saturdays, frequently.

Q.      In 1999, did you work half the year on Saturdays?

A.      Well, I couldn't tell you exactly; but we did work several Saturdays.

Q.      Is several two or three or is it more or less than that?

        MR. HINOJOSA:  Objection, form.

A.      It is more.

Q.      Is it more than five or six?

A.      Yes.

Q.     Is it more than eight or 10?

A.     Yes.

Q.     Is it more than 12?

A.     Sometimes, yes.

Q.     I don't understand.  I'm asking you about 1999.  In 1999, you told me
       that you worked several Saturdays.

       I'm asking you:  How many is several?

A.     Well, I couldn't tell you exactly because I don't remember.

Q.     You don't know how many times, correct?

A.     No, I don't.

(Docket Entry No. 218, Ex. 50 at 42–43).

Numerous plaintiffs were unsure of how many times they worked overtime without proper compensation.  (*See, e.g.*, Docket Entry No. 218, Ex. 54, Montenegro Dep.; Ex. 55, Palacios Dep.; Ex. 56, Quintor Dep.; Ex. 59, Delgado Dep.; Ex. 60, M. Hernandez Dep.; Ex. 61, Umanzor Dep.; Ex. 62, A. Rodriguez Dep.; Ex. 63, Marquez Dep.; Ex. 64, Dominguez Dep.; Ex. 65, Gonzalez Dep.; Ex. 66, Lezama Dep.; Ex. 67, Luna Dep.; Ex. 68, Ortiz Dep.; Ex. 69, Marquez Dep.; Ex. 70, Delgado Dep.)  As previously discussed, the plaintiffs cannot reasonably expected to have recalled at their depositions when they earned overtime for which they were not compensated.  Evidence of hours worked need not be "perfectly accurate" as long as it provides "a sufficient basis to calculate the number of hours worked by each employee."  *Marshall v. Mammas Fried Chicken, Inc.*, 590 F.2d 598, 598 (5th Cir.

1979) (citing *Hodgson v. Jones*, 434 F.2d 1061, 1061 (5th Cir. 1970)).  The time records, coupled with the plaintiffs' testimony, provide a sufficient basis to withstand summary judgment.

Defendants submitted the testimony of two witnesses, Rodriguez and Daniel, and excerpts of plaintiffs' testimony that show uncertainty as to whether they deserved overtime compensation that they did not receive.  Plaintiffs' testimony was often consistent with their arguments that they worked lunch breaks and before their shifts.  Plaintiffs' declarations explained most inconsistencies and further supported plaintiffs' arguments.  Plaintiffs also submitted time records that show significant discrepancies between plaintiffs' shift times and their "clocked in" times.  To resolve the conflicting testimony and evidence requires credibility determinations inappropriate for summary judgment.  Disputed fact issues material to determining whether plaintiffs performed compensable work before their shifts and during their lunch breaks preclude summary judgment dismissing plaintiffs' FLSA claims.

### B.    Plaintiffs' Cross-Motions for Partial Summary Judgment

Plaintiffs argue that defendants did not pay them for time worked outside the scheduled shifts, and that including the additional time worked caused plaintiffs to work more than forty hours a week without receiving overtime pay.  Plaintiffs argue that because their pay records show that they were consistently paid only for scheduled shift time, not for the time between clocking in and clocking out, there is no disputed fact issue as to whether QuietFlex underpaid them.  (*Id.*).

An employer must compensate an employee for all "principal activities" performed during the day.  29 U.S.C. § 254(a)(2) (2000).  Compensable principal activities include those activities "performed as part of the regular work of the employees in the ordinary course of business" and "performed at the employer's behest and for the benefit of the business."  *Dunlop*, 527 F.2d at 401.  The FLSA excludes from coverage those activities "undertaken for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer."  *Barrentine*,750 F.2d at 50.  Even if QuietFlex did not require employees to work before or after their scheduled shift times or through lunch, such work must be included in the number of hours worked during the work week if QuietFlex "suffered" or "permitted" the employees to work in excess of forty hour a week.  29 U.S.C. §§ 203(g), 207(a).  Courts require employers who "know[] or should have known that an employee is or was working overtime" to pay overtime for hours worked in excess of forty hours in a work week.  *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981).

### 1.   *Preshift Work and Work During Lunch*

Plaintiffs argue that the work they performed before and after their shifts and during their lunch breaks consists of compensable "principal activities" under *Dunlop*, 527 F.2d at 401.  Employers do not have to compensate employees for arriving early or staying late when they spend the time engaging in social conversation or performing nonwork-related activities.

*Lindow*, 738 F.2d at 1061.  The issue is whether plaintiffs performed work-related activities before or after their shifts and during their lunch breaks.

Sixty individual plaintiffs provided sworn declarations stating that they were not compensated for all the time they worked.  (Docket Entry No. 232, Ex. C).[6]  For example, Abel Ancelmo stated in his declaration that he, "almost everyday, [] would punch in about 15 minutes early to begin work and QuietFlex never counted that time on [his] paycheck." (Docket Entry No. 232, Ex. C-2).  Ruben Arroyo stated that almost every day he arrived at work "up to 30 minutes early to prepare and QuietFlex never counted that time on [his] paycheck."  (Docket Entry No. 232, Ex. C-3).  Alejandro Giles Baltazar stated that he regularly clocked in fifteen to twenty minutes before his shift began to prepare his area and machine for work.  (Docket Entry No. 232, Ex. C-23).  Jose Fuentes stated that he "punched in, almost everyday, about 20 to 30 minutes before [his] shift so that [he] could get [his] area ready for production and [he] was not paid correctly for this time."  (Docket Entry No. 232, Ex. C-18).  Jose Giles Baltazar stated that he "took fifteen minute lunches and would punch in early for [his] shift because of the pressure to produce as much as [he] could. [He] was never paid for the time [he] had to come in early and QuietFlex always took 30 minutes out of [his] time every day for lunch."  (Docket Entry No. 232, Ex. C-24).  He stated that "[j]ust

---

[6] Defendants argue that summary judgment should be granted as to the eighteen plaintiffs who did not submit a sworn declaration.  Defendants have submitted deposition testimony for these plaintiffs, much of which supports plaintiffs' arguments.  Plaintiffs produced time records for these individuals that show that they regularly clocked in before the start of their shift times.  Plaintiffs have testified to a pattern and practice of employees performing compensable work before their shift and during their lunch break.  This evidence defeats defendants' request. *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1331 (5th Cir. 1985); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 472 (11th Cir. 1982).

about everyday" he would arrive at work "15 minutes early so that [he] could clean and prepare for work, but [he] was not paid for this time."  (*Id.*).  Ciro Dominguez stated that he "regularly went in to work early, before the start of [his] shift, to clean and start work, but [he] does not believe [he] was always paid correctly for the extra work time."  (Docket Entry No. 232, Ex. C-15).  Esteban Estrada stated that he "punched in about 30 minutes before [his] shift everyday and QuietFlex did not count that time on [his] paycheck.  It was not voluntary for [employees] to come in early and [they] were written up if [they] did not come in early before [their] shifts."  (Docket Entry No. 232, Ex. C-16).  Plaintiffs' declarations repeatedly state that they regularly clocked in early and would clean, prepare their areas, and begin working before their scheduled shift times.  (Docket Entry No. 232, Ex. C).

Some plaintiffs also gave deposition testimony that QuietFlex took out 30 minutes from each day's pay even though the employees regularly took lunches that were shorter than 30 minutes.  (*Id.*).  For example, in his deposition, Jose Aleman testified as follows:

> Q.    Did you have any breaks during the day?
>
> A.    Just half an hour for lunch.
>
> Q.    Did you take your lunch break every day?
>
> A.    Yes, every day, yes.

(Docket Entry No. 256, Ex. 7 at 23).  QuietFlex argues that Aleman testified that "he always took his 30 minutes for lunch," but the transcript shows that Aleman said he took lunch every day, not that he took the full 30 minute break every day.  In his declaration, Aleman stated that "QuietFlex always took out 30 minutes everyday from my pay even though I took

lunches that were shorter than 30 minutes and came in early for my shift."  (Docket Entry

No. 232, Ex. C-1).  His deposition and declaration are not inconsistent.

      Ruben Arroyo similarly testified in his deposition that he "gets" lunch breaks.  He

testified as follows:

      Q.     When do you take your lunch hour?

      A.     At 11:00.

      Q.     Throughout your entire employment with QuietFlex, you have gotten
             a lunch break, correct?

      A.     Yes.

      Q.     And how long is your lunch break?

      A.     30 minutes.

(Docket Entry No. 256, Ex. 9 at 17).  Arroyo clarified in his declaration that, despite being

allowed thirty-minute lunch breaks,  he "took short lunches, 15 to 20 minutes long, in order

to keep up with production demands, but QuietFlex would always take out 30 minutes for

lunch everyday."  (Docket Entry No. 232, Ex. C-3).

      Manuel Bautista testified in his deposition that he sometimes would take less than his

full lunch time and sometimes would not take any lunch break at all:

      Q.     How often would you say that you took the full lunch break during the
             week?

      A.     Well, it all depended, because, sometimes, they would give us a whole
             hour for us to go and have lunch.  But we would take, like 20, 15, or 30
             minutes.

      Q.     Were there some days that you didn't take a lunch break at all?

A.    Yes.

Q.    How often would that occur?

A.    It all depended on how production went.

Q.    If you could give me an average, to the best of your knowledge, I would appreciate it.

A.    Sometimes, it would be like two or three times.

Q.    And other times, you would always take your lunch break?

A.    Not all the time.

Q.    I'm just simply trying to pin down: On average, how long did you spend for lunch?

A.    I don't know.

Q.    And the answer is still: Do you think it's probably too difficult to give me an average?

A.    Well, sometimes, it was just 30 minutes, because I couldn't take the whole time because I wasn't going to make any money that way.

(Docket Entry No. 256, Ex. 12 at 17–18).   In his declaration, Bautista stated that he "regularly took only 15 to 20 minutes for lunch so that [he] could catch up on work, but QuietFlex would always take out 30 minutes for lunch everyday."  (Docket Entry No. 232, Ex. C-4).

Pedro Borja stated in his declaration that "QuietFlex always automatically took 30 minutes out of [his] timecard everyday for lunch, but there were times when [he] took a shorter lunch and other times [he] did not even take a lunch break."  (Docket Entry No. 232, Ex. C-5).  He testified in his deposition that it was "usual for the employees to work through

33

lunch." (Docket Entry No. 256, Ex. 13 at 31).  Benito Dominguez stated in his declaration that he "regularly took only 20 minutes for lunch and other times [he] did not take lunch so that [he] could finish production work, but QuietFlex would always take out 30 minutes for lunch everyday." (*Id.*).  Dominguez also testified at his deposition that he sometimes choose not to take his lunch break because "if [he] took the break, [he] wouldn't make money." (Docket Entry No. 256, Ex. 21 at 20).

Defendants assert that many plaintiffs admitted in their depositions that QuietFlex allowed them thirty minute lunch breaks and that employees regularly took lunch breaks. This is not inconsistent with the declarations the plaintiffs submitted stating that they regularly took less than their full thirty minute lunch break, returning to work early to do production work.

Defendants argue that plaintiffs did not perform principal activities during the time they were "clocked in" but before their scheduled shifts began.  As previously discussed, Santiago Rodriguez, the Department 911 superintendent, testified that employees are not allowed to work during their lunch break and that, to his knowledge, "since August of 2000, no Department [911] or Shipping Department employee has worked during the lunch break." (Docket Entry No. 256, Ex. 1 ¶ 9).  Rodriguez testified that employees clock in and wait in the lunchroom until their shift begins and since 2001 have been prohibited from clocking in more than fifteen minutes before their shift begins.  (Docket Entry No. 256, Ex. 1 ¶ 7). Rodriguez also testified that employees cannot work before or after their shifts because their work requires the use of shared machines.  (*Id.* ¶ 9). Dan Daniel also testified that employees

34

do not work during their lunch breaks or before their shift time.  (*Id.*, Ex. 2).  Defendants also

note that several employees testified that, although they would "clock in" early, they would

wait to begin working.  Cesar Vela testified:

> Q.    Okay.  Was there ever a time at QuietFlex where you might clock in
>       and wait 15 or 20 minutes before your shift began when you were not
>       working?
>
> . . .
>
> A.    Could you repeat that again?
>
> Q.    Sure.  Was there ever a time when you would clock in but not go to
>       work right away?
>
> . . .
>
> A.    Yes.  I would get there 10 minutes earlier and I would sit at the
>       lunchroom to wait for my starting time about 10 or 15 minutes.

(Docket Entry No. 256, Ex. 64A, at 18–19).  Plaintiffs point out that Vela answered the "was

there ever a time" question and that his testimony shows while he would often work for

approximately 15 minutes before the start of his shift, there were times he would wait for his

shift to start.  (Docket Entry No. 276 at 6–7).

Defendants also cite testimony from Fernando Gonzalez, as follows:

> Q.    Now, let me ask you this: When you punched in the card, did you
>       always go to work right away; or did you wait for the shift to begin
>       before you began working?
>
> A.    No.  I would go – well, I would find my card; and I would wait for the
>       shift to finish.  Others – others – no.  If I was doing the night shift, I
>       waited for the second shift to end; and then I would go to work.
>
> Q.    So, even though you were punched in, you wouldn't actually begin
>       working on the third shift until the second shift had completed?

A.      Yes, I would wait for them to finish.

(*Id.*, Ex. 30A, at 27–28).  Gonzalez stated in his declaration that he believed he was "not properly paid for the time" that he worked and that he often took short lunches that were not compensated.  (Docket Entry No. 232, Ex. C-26).

Plaintiffs offer extensive evidence that they worked before their shifts and during their lunch breaks.  They also submit time records that show significant discrepancies between their "clocked in" times and their scheduled and compensated shift times.  Defendants have produced controverting competent summary judgment evidence, including Santiago Rodriguez's testimony, Dan Daniel's testimony, and testimony by some of the plaintiffs. Resolution of the conflicting testimony requires credibility determinations not appropriate on summary judgment.  Material issues of fact exist as to whether plaintiffs worked before the start of their shifts and during their lunch breaks and whether this time, if any, raised them above forty hours of work in a work week.

2.    *Nonproductive Work*

Plaintiffs argue that they were not paid for the nonproductive work they performed cleaning bathrooms and lunchrooms.  (Docket Entry No. 276 at 8).  Many plaintiffs testified that they often had to work "off the clock" to clean the lunchroom and bathroom.  (Docket Entry No. 232, Ex. C).  Abel Ancelmo stated in his declaration that he had to clean bathrooms and the lunchroom at QuietFlex two to four times a week, was not paid for that time, and "was never told before [he] started working there that cleaning the bathrooms and

lunchrooms would be part of [his] job." He also stated that he "never was told that cleaning them would be part of [his] production pay." (Docket Entry No. 232, Ex. C-2).

Alejandro Giles Baltazar testified in his deposition that he sometimes worked off-the-clock:

> Q. Did you ever do work for the company, you know, work that they asked you to do before you clocked in?
>
> A. No, sir, I don't remember.
>
> Q. Did you ever clock out when your shift or when your day was over and go back and do work for the company?
>
> A. Yes.
>
> Q. How many times did you do that?
>
> A. However many times I was called through the speakers.
>
> Q. Well, I don't know how many times that is, sir. You're the best evidence of how many times that is. So, what number is that?
>
> A. Well, I could not tell you how many times because I don't keep track of that.
>
> Q. Do you think it was more or less than three?
>
> A. It was more.

(Docket Entry No. 256, Ex. 10 at 23).

Alejandro Giles Baltazar submitted a declaration stating that he "worked off the clock for QuietFlex cleaning the bathrooms and lunchrooms. I was told to do this about 10 times and each time worked for about 20 minutes." (Docket Entry No. 232, Ex. C-23). Jose Giles Baltazar stated in his declaration that he was forced to clean bathrooms and the lunchroom

37

"off the clock."  (Docket Entry No. 232, Ex. C-24).  He testified in his deposition that this

happened about twice each week until January 2000.  (Docket Entry No. 256, Ex. 11 at

29–30).  He testified that sometimes he would "punch [his] card and they would call [him]

back and tell [him] that he had to go and clean."  (*Id.* at 29).  Gelacio Cuevas-Roman testified

in his deposition that he had to clean the lunchroom, bathroom, tools, or hallway

approximately once a week, after clocking out for the day.  (Docket Entry No. 256, Ex. 16).

Mario Delgado declared that "there were also a couple of times when [he] had to work after

[he] had clocked out."  (Docket Entry No. 232, Ex. C-12).  In his deposition testimony,

Delgado testified that he almost always cleaned the bathrooms and lunchrooms after clocking

out.  He testified that he had to perform such cleaning "[e]very other day or every three

days."  (Docket Entry No. 256, Ex. 19 at 22).  He further testified:

> Q.   And when you worked on the third shift, at what time did you clean
>      bathrooms?
>
> A.   Well, I was going home.  I had already punched my card out.  And I
>      was already at the parking lot and then they would call me through the
>      speaker system because I hadn't cleaned the bathrooms.
>
> Q.   So, you typically cleaned the bathrooms after your shift was finished;
>      is that right?
>
> A.   Yes.
>
> Q.   Did you ever clean the bathrooms during your shift?
>
> A.   But they always did it when we had finished clocking out.
>
> Q.   Did you clean the lunchroom during or after your shift?
>
> A.   After my shift had ended.

Q.      Did you clock out before you cleaned the lunchroom?

A.      Yes.

(*Id.* at 24).  Jose Fuentes stated in his declaration that "[o]nce a week, sometimes more, [he] had to clean the bathrooms and lunchrooms at QuietFlex, before January of 2000.  [He] cleaned after [his] shift was over, so [he] was never paid for that time."  (Docket Entry No. 232, Ex. C-18).

A number of plaintiffs testified that they had to clean bathrooms and the lunchroom after clocking out.  Defendants argue that the piece rate compensates employees for the time spent performing nonproductive work.  *See* 29 C.F.R. § 778.318(a).  Section 778.318(a) allows employers to not pay additional wages for nonproductive work if it is " understood by the parties that the other compensation received by the employee is intended to cover pay for such hours."  *Id.*

Defendants submitted an expert report by Raymond G. Cordelli in which he states that plaintiffs' "non productive work" is properly compensated by the defendants' piece rate system.  (Docket Entry No. 218, Ex. 75).  Plaintiffs move to exclude Cordelli's testimony.  (Docket Entry No. 246).  Federal Rule of Evidence 702 permits expert testimony if it "will assist the trier of fact to understand the evidence or determine a fact issue."  An expert witness may not provide legal conclusions.  FED. R. EVID. 704 Committee Note.  As with any other witness, testimony offered under Rule 702 may be excluded if its probative value is substantially outweighed by the likelihood of confusion or needless presentation of cumulative evidence.  FED. R. EVID. 403.

Cordelli discusses the FLSA requirements concerning overtime pay, discusses his own investigation into QuietFlex's pay practices, and concludes that employees were paid properly under the FLSA. Cordelli opines that plaintiffs agreed to a piece rate that was augmented to allow for nonproductive work. Cordelli relies on information from three QuietFlex employees—Cindy Pham, who does payroll; Santiago Rodriguez, the Duct Plant Supervisor; and Becky -Burchfield, the Human Resources Manager—who testified that employees were not paid separate hourly rates when they did janitorial work. This evidence does not provide a basis to conclude that plaintiffs agreed that their piece-rate pay included compensation for janitorial duties. Cordelli's opinion as to whether plaintiffs did, or did not, make such an agreement, and his resulting opinion as to FLSA compliance, is stricken. *See Singer v. City of Waco, Tex.*, 324 F.3d 813, 822 (5th Cir. 2003) (limiting expert's testimony to general interpretation of FLSA).

Plaintiffs assert that they did not agree to cleaning the lunchroom and bathroom when they were hired and were never told that compensation for such activities would be included in their production pay. (Docket Entry No. 232, Ex. C). Defendants do not argue that plaintiffs overtly agreed to such a system in an employment agreement, but that plaintiffs tacitly accepted such an agreement by continuing to work at QuietFlex after they learned they were required to clean bathrooms and the lunchroom. (Docket Entry No. 256 at 17). By continuing to work at QuietFlex after learning of these responsibilities, plaintiffs did accept such responsibilities as part of their job. *See Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986). QuietFlex has not shown, however, that plaintiffs agreed or understood that

their piece-rate compensation would also compensate them for their nonproductive hours. The plaintiffs' testimony shows only that they believed they were not compensated for this time.  The record reveals disputed fact issues material to determining whether plaintiffs and QuietFlex agreed that the piece-rate compensation would pay employees for their nonproductive time, precluding summary judgment as to this issue.

## IV.   Conclusion

Defendants' motion for partial summary judgment as to plaintiffs' FLSA claims is denied.  Plaintiffs' cross-motion for partial summary judgment as to their FLSA claims is denied.

SIGNED on March 31, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

41