# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| FERMIN COLINDRES, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-4319 |
| | § | consolidated with H-01-4323 |
| QUIETFLEX MANUFACTURING, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiffs, present and former employees of defendants QuietFlex Manufacturing Co., L.P., QuietFlex Holding Co., Goodman Manufacturing Co., L.P., and Goodman Holding Co., allege racial and national origin discrimination and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. The plaintiffs have moved for class certification under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, seeking injunctive and declaratory relief, back pay, and classwide punitive damages. The EEOC has previously moved for, and this court has granted, certification of a class alleging a pattern and practice of racial and national origin discrimination under section 706(f)(1) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

The following motions are addressed in this opinion:

- Plaintiffs' motion for class certification (Docket Entry No. 80)

- The parties' joint motion to extend the March 30, 2006 deadline (Docket Entry No. 205)

- Plaintiffs' motion to substitute named representatives (Docket Entry No. 208)

- Defendants' motion to dismiss nineteen claimants under Rule 37(d) (Docket Entry No. 215)

- Plaintiffs' motion to strike Docket Entry No. 236 (Docket Entry No. 240)

- Plaintiffs' motion for leave to submit recently-produced evidence relevant to the issue of class certification (Docket Entry No. 241)

- Defendants' motion for leave to refile section 11.C of defendants' June 6, 2005 brief (Docket Entry No. 243)

- Plaintiffs' motion for summary judgment that defendants are an integrated enterprise (Docket Entry No. 245)

- Defendants' motion for leave to file a motion for partial summary judgment as to plaintiffs' retaliation claims and a supplemental response to plaintiffs' motion for class certification (Docket Entry No. 259)

- Defendants' motion for partial summary judgment as to plaintiffs' retaliation claims (Docket Entry No. 260)

- Defendants' motion for leave to file a posthearing supplemental brief (Docket Entry No. 295)

- Plaintiffs' motion to reopen discovery and for leave to file a supplemental brief on the issue of class certification (Docket Entry No. 299)

Plaintiffs have also alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Defendants have filed motions for partial summary judgment as to certain of the individual plaintiffs' FLSA claims. Those motions are addressed in a separate memorandum and opinion.

This court held a four-day hearing on the class certification motion, hearing testimony

from eight current and former employees and two expert witnesses opining on how to calculate classwide back pay.  The parties submitted posthearing supplemental expert reports on back pay calculations and, on March 10, 2005, presented oral argument on the class certification motion.  Postargument briefing followed.  Based on the pleadings; the motions, responses, and replies; the parties' submissions; the testimony at the hearing; the arguments of counsel; and the applicable law, this court enters the following rulings:

- denies plaintiffs' motion for certification of classes that include classwide punitive damages;

- denies defendants' motion to dismiss nineteen claimants;

- grants the joint motion to extend the deadline for deposition of Rule 30(b)(6) witness;

- grants plaintiffs' motion to substitute named representatives;

- denies plaintiffs' motion to strike Docket Entry 236;

- grants plaintiffs' motion for leave to submit recently-produced evidence relevant to class certification;

- denies defendants' motion for leave to refile section II C of their June 6, 2005 brief;

- denies plaintiffs' motion for summary judgment on the integrated enterprise issue;

- grants defendants' motion for leave to file a motion for partial summary judgment and a supplemental response to plaintiffs' motion for class certification;

- denies defendants' motion for partial summary judgment as to plaintiffs' retaliation claims;

- grants defendants' motion for leave to file a posthearing supplemental brief; and

- grants plaintiffs' motion to reopen discovery and for leave to file a supplemental brief.

The reasons for these rulings are set out below. The court also sets a hearing for April 14, 2006, at 2:00 p.m., to review the impact of these rulings and set a schedule and docket control order.

## I.    Background

The QuietFlex manufacturing plant in Houston, Texas produces flexible air conditioning ducts and component products. The plant is a large building separated into six departments. Employees are assigned to specific departments. Department 910 is the department that makes cores and jackets for the ducts. Department 911 is the department that assembles the core, jacket, and fiberglass components to create the finished products. Department 906 is the shipping department.

Since approximately the early 1980s, Department 910 employees have been almost exclusively Vietnamese. Department 906 and 911 employees have been almost all Latino. The plaintiffs, present and former employees who were assigned to Departments 906 and 911, allege that defendants segregated the unskilled workforce by race. The plaintiffs allege that defendants "systematically initially assign Latinos into Department 911" and "systematically refuse to assign Latinos in Department 910." (Docket Entry No. 55, ¶¶ 27–28). The segregation cannot be explained by job skill differences, because Departments 910 and 911 have the same entry requirements: no skills required. (*Id.* ¶ 23). The plaintiffs

allege that Department 910 offered the best pay and work conditions in the plant and Department 911 the worst.  According to the plaintiffs, workers in Departments 911 and 906 receive lower compensation than workers in Department 910; have more physically demanding and dangerous jobs; are provided inadequate safety equipment; and are more frequently injured.  (*Id.* ¶¶ 36–53).  The plaintiffs allege that Department 910 has better working conditions than Department 911, where workers are exposed to more fiberglass particles that itch and irritate the skin.  The plaintiffs also allege that they were subjected to harassment from their supervisors, such as "inspections" that included supervisors "stomping" on employees' feet, and required to perform menial tasks, such as cleaning lunchrooms and bathrooms, not required of the Department 910 employees.  (*Id.*; Docket Entry No. 188 at 22).

The plaintiffs allege that the defendants perpetuated the discrimination that "channeled" Latino workers to Departments 911 and 906 and Vietnamese workers to Department 910 by precluding or deterring Latinos working in Departments 906 and 911 from transferring to Department 910.  Two specific policies are alleged:  requiring that Latino applicants for Department 910 be able to speak English, without imposing such a requirement on Vietnamese applicants for Department 910; and adhering to a departmental seniority policy that gives preference to employees already working in some of the Department 910 shifts or sections to transfer to other shifts or sections within that department.  (Docket Entry No. 55).  Until recently, Department 910 had three shifts and was organized into two sections, one for "jacket" and one for "core."  If a vacancy arose in the

first shift, preference would be given to those seeking transfer from the second shift, and applicants from the third shift would be given preference to fill the second shift vacancy. Within sections, jacket department vacancies were preferred over core department vacancies. (Tr. T. III at 145–50).  Plantwide seniority applied after intradepartment seniority.[1]

The defendants acknowledge that from the early 1980s, the work force in Department 910 was almost entirely Vietnamese and the work force in Departments 911 and 906 almost entirely Hispanic.  Defendants assert that during the proposed class period, however, there have been significant changes in the conditions that plaintiffs identify as the basis for their suit.  The English-fluency requirement, according to the defendants, has changed over time and is not an English-fluency policy applied only to Latinos but rather a policy requiring that all employees be able to communicate with supervisors.  For a long period, the supervisors in Department 910 only spoke Vietnamese or English, but defendants assert that they have now put Spanish-speaking supervisors in at least some shifts.  Defendants assert that the transfer policy of intradepartmental seniority has a legitimate business purpose.  Defendants also assert that they have made concerted efforts to increase the number of Latino workers in Department 910 since 1997 and that most of the recent hires into that department have been Latino.  Since 2002, rather than relying on word-of-mouth to fill vacancies, defendants

---

[1]  The plaintiffs filed an opposed motion for leave to submit recently-produced evidence of how recent openings in Department 910 were filled, arguing that the evidence showed that the defendants continued to impose an English-fluency requirement on new hires and transfers to that department.  (Docket Entry No. 241).  Defendants have responded to the motion, arguing that the evidence is not new.  The defendants have shown no unfair surprise or prejudice and have had a full opportunity to respond to the evidence.  The  motion for leave to submit evidence on recent hires and transfers in Department 910 is granted.

have used an employment agency for hiring and transfers. Defendants also assert that work conditions have changed during the pendency of this suit. The manufacturing and assembly process has become increasingly automated, making the work in Department 911 less physically demanding. The defendants emphasize that since the January 2000 walkout, some of the work practices that the plaintiffs cite as the most offensive have been changed or abandoned. For example, defendants no longer require the Latino employees to clean bathrooms or lunchrooms, and some of the supervisors who allegedly were the most derogatory toward Latino employees have been fired or replaced. (Tr. T. I at 54, ll. 17–21; Docket No. 194, Ex. 27).

Plaintiffs respond that despite some changes, defendants have retained policies and practices that have a discriminatory impact or are discriminatorily applied. For example, according to plaintiffs, defendants' policy of only allowing employees who have worked for six months at the plant to transfer and only if they have no final warnings and no other transfers within the past six months is applied consistently to Latino employees but not to Vietnamese employees. Plaintiffs allege that defendants continue to pay unequal piece work rates for equivalent work, resulting in lower pay for Department 911 and 906 employees.

The evidence at the class certification hearing showed that from 1998 to 2002, Department 906 was approximately 90.9% Hispanic, Department 910 was 7.14% Hispanic, and Department 911 was 97.8% Hispanic. (Docket Entry No. 81, Ex. 2-A at 2). Defendants contend that since approximately 2000, and particularly since this lawsuit was filed, they have attempted to increase the number of Latinos working in Department 910 by allowing

Latinos to transfer from Departments 906 and 911 as quickly as vacancies in Department 910 occur. Defendants contend that although the low turnover in Department 910 has slowed the effort to increase the number of Latinos in Department 910, from October 10, 1997 to March 15, 2004, twenty of the thirty-six new entrants into Department 910 were Hispanic; eighteen of those twenty were hired after October 16, 2000; and that "over the past seven years, more than 60 percent of entrants into Department 910 have been Hispanic." (Docket Entry No. 194 at 6–8). Of the thirty-six entrants into Department 910 from October 1997 to March 2004, twelve were Asian and four African-American.[2] The record shows that Department 911 continues to remain almost all Latino. (*See* Defendants' Hearing Ex. H (showing that all Department 911 employees as of October 2004 were Latino)).

The evidence as to the English-language fluency requirement for hiring or transfer into Department 910 shows that over time, the postings for vacancies in that department changed from stating that English fluency was required to stating that those seeking transfer be able to communicate with their supervisors. (Docket Entry No. 116 at 14). The evidence

---

[2] Defendants have filed a motion for leave to file a posthearing supplemental brief, in which they argue that the racial makeup of the departments at QuietFlex has continued to change over time. (Docket Entry Nos. 295, 296). Defendants argue that, since March 15, 2004, there have been an additional 19 entrants into Department 910, and 14 of these have been Hispanic. Plaintiffs have responded. (Docket Entry No. 299). Plaintiffs argue that they have the burden of showing the requirements for class certification have been met and should therefore have the final opportunity to be heard on the issue. (*Id.* at 4). Plaintiffs argue that defendants' new evidence has not been verified and that its allowance would prejudice them. (*Id.* at 5). If defendants' motion for leave to file its brief is granted, plaintiffs ask that discovery be reopened and that plaintiffs be allowed to reply. (*Id.* at 6).

The issue of class certification has been extensively briefed by both sides. Defendants' motion for leave to file a posthearing supplemental brief is granted, but the additional information does not form the basis for the class certification decision. If plaintiffs continue to pursue class certification, they will be permitted to conduct discovery to verify the recent information and to submit the results to the court.

at trial showed that Vietnamese workers in Department 910 were not required to speak English, but Latino employees seeking employment in that department had to show English-speaking ability.  George Ibanez testified that there were non-English-speaking Vietnamese employees working in Department 910, even when company policy required workers seeking transfer to that department to speak English.  (Docket Entry No. 202, Ex. I at 34).  The evidence also showed that during the relevant period, some of the supervisors in Department 910 spoke only English, which plaintiffs assert supports their argument that the language requirement was applied discriminatorily.

Dung Trung Tran, a Department 910 employee, testified that his supervisor speaks only English and that Tran speaks limited English.  Tran testified as follows:

Q.     When you speak with your supervisor, what language do you speak in?

A.     Yeah, I speak in English because he's an American.  So, I have no choice but speaking English; and then my English is not good either.  So, I'm both speaking and giving sign language.

Q.     You communicate by using your hands, for example?

A.     That's the reason I rarely talk to him.

Q.     But you still do your job and do your job well even though you rarely talk to your supervisor?

A.     Yes, I make an effort.

(Docket Entry No. 202, Ex. G-7 at 11).  Even when Spanish-speaking supervisors were employed in Department 910, and the postings required an ability to communicate with supervisors rather than an ability to speak English, the evidence showed that defendants still

required Latino employees seeking to transfer to Department 910 to be able to speak English. David Garcia, a Spanish-speaking former supervisor of Department 910, testified that he would be able to communicate with a person who "could speak only Spanish or primarily Spanish." (Docket Entry No. 202, Ex. I-2 at 77). He testified that he and the other two Department 910 supervisors, Can Le and John Brown, rotated among the three shifts. (*Id.* at 105). Garcia was unable to explain why each posting for job openings in Department 910 listed Can Le, the only 910 supervisor who speaks no Spanish, as the shift supervisor with whom workers would have to be able to communicate. (*Id.*). Garcia testified as follows:

> Q.   And when we were talking earlier about the language on the job postings, that seems to indicate that a person attempting to transfer had to be able to communicate or read instructions or what was it – work with –
>
> A.   Understand work instructions.
>
> Q.   Yeah, understand work instructions as directed by his or her supervisor. Do you recall us having that conversation regarding the language on the postings?
>
> A.   Yes.
>
> Q.   On the postings that you have there, both in, I think all three, Exhibit 1, 2, and 3, the supervisor that is named on those is Can Le. Is that correct? And you can look through Exhibit 1 to see if you agree.
>
> A.   Yes.
>
> Q.   Is it – now, it was your testimony earlier that you would rotate shifts, correct?
>
> A.   Correct.
>
> Q.   Each shift supervisor. And there doesn't appear – and these postings – and I'll show you some others as well. No supervisor's name appear on those three that you have in front of you other than Can Le. Is that correct? Your name is not on there. Is that right?

10

A.      Yeah, that's correct.

Q.      And nowhere on there is the other gentleman, John Brown?

A.      John Brown.

Q.      Was it – and this is, of course, to your understanding.  Was it Can Le's name that was always put on the job postings for Department 910?

        MS. BIRENBAUM: Objection.  Calls for speculation.

A.      I don't know.

Q.      So, based on the testimony that we had earlier about the changing of supervisors or shift supervisors for every shift, it appears that the postings for one, that are illustrated in Exhibit 1, 2, and 3, and all of those, it just happened that it was Can Le's shift, correct, or during his turn as supervisor.  Is that right?

A.      I don't know why they – I don't know why it's Can Le's name is on there.

Q.      Are you saying that there could have been – are you saying that you know for sure that on one of these you were actually the supervisor in Department 910 or the shift supervisor?

        MS. BIRENBAUM: Objection.

A.      Like I say, I don't know why Can Le's name is on there, why HR put Can Lee's [sic] instead of my name or John Brown's name.

(Docket Entry No. 202, Ex. I-2 at 104–06).

        The plaintiffs also allege discrimination in pay.  QuietFlex pays employees in Departments 910 and 911 on a piece rate system.  (Docket Entry No. 116, Ex. 3 at 111).  The rates vary depending on the job and the sizes of the pieces.  (*Id.*).  Employees' daily wages are determined by multiplying the number of pieces made or assembled by the rate for those

pieces.  If the resulting wage is less than $7.00 an hour, QuietFlex pays that employee $7.00 an hour.  (Docket Entry No. 116, Ex. 10 at 17).  Plaintiffs allege that Department 910 employees earn more money for work that requires no more skill than the work performed in Department 911 but involves less strenuous manual labor.  Plaintiffs produced  a job analysis report that defendants had commissioned in May 2000 by Jeanneret & Associates. (Docket Entry No. 202, Ex. L).  The stated purpose of that report was to "analyze and compare nine target jobs for QuietFlex Manufacturing Company and to identify compensation rates for similar jobs in the relevant local labor market." (*Id.* at 1).  The report stated:

> The relative comparisons between QuietFlex jobs allowed for the identification of appropriate pay differences between the positions (i.e., which jobs should be paid more based on internal relationships).  The analysis of labor market compensation data allows for a comparison of QuietFlex's typical pay rates to the rates for similar positions (i.e., positions requiring similar skill levels) in the relevant labor market.

(*Id.*).  The study compared the jobs in Departments 910 and 911 as they were performed in **2000.  The Jeanneret study assigned points for different jobs based on factors such as physical exertion, working conditions, decision making, trouble shooting, adjusting/monitoring, and leading/coordinating. (*Id.* at 4).**  The report concluded that "[t]he total job evaluation points for most jobs were relatively similar.  For instance, the Core Assembler, Bagger, and Floater positions all received almost equal job evaluation point totals." (*Id.* at 5).  The report assigned identical values to the Core Operator position in Department 910 and the Duct Bagger and Duct Assembler positions in Department 911.  (*Id.*

at 7).  Defendants' expert, Dr. Jones, retained for this lawsuit, disagreed with the report findings.  The evidence shows that defendants obtained the report in 2000 for general business purposes.  (Docket Entry No. 229, Ex. 5).

The record shows that in general, Latino employees in Department 911 were paid less than the employees in Department 910. (*See* Docket Entry No. 116 at 11).  For example, during the week ending August 9, 2003, the five highest-paid jacket operators in Department 910 earned, per hour, $20.17, $19.99, $19.58, $19.20, and $18.58.  The five highest-paid core operators in Department 910 earned, per hour, $20.70, $20.38, $20.22, $19.64, and $19.33. The five highest-paid machine operators in Department 911 earned, during the same week, per hour, $18.10, $17.93, $17.32, $17.32, and $17.08.  The five highest-paid baggers in Department 911 earned, per hour, $16.69, $15.03, $14.35, $13,70, and $13.30.  (*Id.*).

On January 10, 2000, the Department 906 and 911 employees staged a walkout to protest their working conditions.  (Docket Entry No. 55 at ¶ 6).[3]  QuietFlex discharged the protesting workers after they refused to leave company property during the work stoppage. (*Id.*; Docket Entry No. 120 at 2–3).  QuietFlex rehired the workers approximately two weeks later but did not pay them for the two weeks they did not work.  (Docket Entry No. 8 at ¶ 24; Ex. A-4).

The plaintiffs allege both disparate treatment and disparate impact discrimination and retaliation against those who participated in the walkout, in violation of Title VII, 42 U.S.C.

_____

[3]  The walkout is described in greater detail in this court's June 24, 2002 Memorandum and Opinion. (Docket Entry No. 44).

§ 2000(e), and 42 U.S.C. § 1981.  (Docket Entry No. 55 at ¶¶ 86–87).  Plaintiffs filed a

motion for class certification under Rules 23(b)(2) or 23(b)(3).  (Docket Entry No. 80).  The

plaintiffs propose the following class:

> All current and former Latino employees who worked in Departments 911 and
> 906 at any time during October 10, 1997 to the present and who were
> subjected to Defendant's discriminatory policies and practices.

(Docket Entry No. 188 at 6).

The plaintiffs initially sought class certification for their claims of compensatory

damage for the segregated nature of the plant and the discriminatory treatment and pay.

After the certification hearing, the plaintiffs withdrew their effort to seek compensatory

damages on a classwide basis.  Instead, the plaintiffs move for class certification as to their

claims for a declaratory judgment and injunction against defendants' racially-discriminatory

hiring and transfer policies and disparate pay, equitable damages in the form of back pay, and

classwide punitive damages.  (Docket Entry No. 81 at 19).[4]  In response to plaintiffs' motion

for class certification, defendants assert that the plaintiffs cannot meet the requirements of

Rule 23(a), (b)(2), or (b)(3).

The defendants have raised a separate and substantive challenge to the plaintiffs'

retaliation claims.  The defendants argue that plaintiffs' Title VII and section 1981 retaliation

claims arising from their termination on January 10, 2000 are barred by issue and claim

preclusion, because the National Labor Relations Board (NLRB) issued an opinion on June

---

[4]  In their March 2, 2005 brief, plaintiffs amended their claim to withdraw their request to certify a
class seeking compensatory damages.  The plaintiffs reserved their right to pursue compensatory damages
on behalf of individual plaintiffs if the class is not certified.  (Docket Entry No. 202 at 4 n.3).

30, 2005 finding that QuietFlex did not retaliate against the protesting workers by discharging them and did not violate section 8(a)(1) of the National Labor Relations Act (NLRA).  (Docket Entry No. 260).[5]  This issue and claim preclusion challenge is addressed at the outset.  The opinion then addresses the plaintiffs' effort to obtain summary judgment that the defendants are an integrated enterprise.  The third part of the opinion addresses the class certification issues.

## II.    Defendants' Motion for Partial Summary Judgment as to the Retaliation Claims

On January 10, 2000, QuietFlex discharged employees in Departments 906 and 911 who staged a walkout in protest of their working conditions and refused to leave company property when ordered to do so.  (Docket Entry No. 55 at ¶ 6).  Plaintiffs allege that the walkout and related actions were protected activity under Title VII and section 1981 and that QuietFlex engaged in impermissible retaliation by discharging the protesting employees.  (Docket Entry No. 279 at 2).   The National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, makes it an unfair labor practice for an employer to interfere with employees' exercise of their section 7 rights.  29 U.S.C. § 158(a)(1).  On-the-job work stoppages can be

---

[5] Defendants moved on July 28, 2005 for leave to file a motion for partial summary judgment against plaintiffs' retaliation claims and to supplement the briefing on the issue of class certification because of the June 30, 2005 NLRB decision.  (Docket Entry No. 259).  Plaintiffs and intervenor EEOC argue that the NLRB decision is irrelevant to this lawsuit and oppose defendants' submission of a motion after the July 1, 2005 pretrial motions deadline.  (Docket Entry Nos. 266, 278).  Federal Rule of Civil Procedure 15(d) allows a party to serve a supplemental pleading that sets forth "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  The NLRB decision was issued after the July 1 deadline, though apparently decided one day before it.  (Docket Entry No. 259 at 3).  Defendants filed their motions very quickly thereafter.  Plaintiffs have responded to the defendants' motion.  (Docket Entry No. 279).  The NLRB decision is relevant to the issues in this case.  This court grants defendants leave to file their motion for partial summary judgment and to supplement the briefing.

a form of protected economic pressure under section 7, *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 15 (1962), but not every such work stoppage is protected, *see Cambro Mfg. Co.*, 312 NLRB 634 (1993).

On June 30, 2005, the National Labor Relations Board affirmed an administrative law judge's finding that QuietFlex's decision to fire employees who engaged in the January 10, 2000 work stoppage did not violate section 8(a)(1) of the NLRA. *QuietFlex Mfg. Co., L.P.*, 344 NLRB 130 (Docket Entry No. 260, Ex. 3). Defendants argue that the NLRB decision should be given preclusive effect in this case and move for partial summary judgment dismissing the retaliation claims. (Docket Entry No. 260 at 7–8; Docket Entry No. 261 at 3). **A.    The Applicable Legal Principles**

*1.    Summary Judgment*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential

element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

### 2. Claim and Issue Preclusion

*Res judicata*, or claim preclusion, bars relitigation of a claim that a party raised or could have raised in a prior adjudication. *Arizona v. California*, 530 U.S. 392, 424 (2000); *Smith v. Waste Mgmt.*, 407 F.3d 381, 386 (5th Cir. 2005). Claim preclusion applies when there was a prior final judgment on the merits; the prior judgment was between identical parties or those in privity with them; and there is a second action based on the same claims that were raised or could have been raised in the first action. *Smith*, 407 F.3d at 386. "Application of res judicata requires an identity of causes of action. If that test is met, the former judgment may be conclusive as to all issues which were or might have been litigated." *Garner v. Giarrusso*, 571 F.2d 1330, 1336 (5th Cir. 1978). The Supreme Court has held that agency adjudication can have a preclusive effect in later judicial proceedings. *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422 (1966).

Issue preclusion, or collateral estoppel, prohibits relitigation of an issue of fact or law when the issue is actually litigated, determined by a final judgment, and essential to the judgment of a prior tribunal. *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 232 n.5 (1998); *Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 932 (5th Cir. 1999)

18

([R]elitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings.").

### B.    Analysis

To present a *prima facie* case of retaliation under Title VII or section 1981, a plaintiff must show that: (1) he engaged in a "protected activity"; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004); *see also Foley v. Univ. of Houston Sys.*, 324 F.3d 310, 316 (5th Cir. 2003) (the elements for establishing a *prima facie* case of retaliation under section 1981 are identical to those that must be established under Title VII). This court has previously held that plaintiffs have presented a *prima facie* case of retaliation under both Title VII and section 1981. Once plaintiffs make a *prima facie* case of retaliation, the burden shifts to the defendants to proffer a legitimate reason for the adverse employment action. *Davis*, 383 F.3d at 320.

"Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *San Remo Hotel, L.P. v. City & County of San Francisco, CA*, 125 S. Ct. 2491, 2500 n.16 (2005) (citation omitted); *see also Liberto v. D.F. Stauffer Biscuit Co., Inc.*, No. 04-50308, 2006 WL 392046 at *5 (5th Cir. Feb. 21, 2006). Claim preclusion does not bar the plaintiffs' retaliation claims in this case because the plaintiffs could not have raised those claims in the NLRB proceeding. The NLRB decision dealt with an alleged violation of the National Labor

19

Relations Act, not with an alleged violation of Title VII's antiretaliation provision. "Although these two acts are not totally dissimilar, their differences significantly overshadow their similarities." *Tipler v. E.I. duPont deNemours & Co.*, 443 F.2d 125,128 (6th Cir. 1971) (citing *Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969)). The "purposes, requirements, perspective and configuration" of these two statutes differ. *Id.* at 129. "Title VII and the NLRA are statutes with separate and independent remedies. . . . Though Title VII and the NLRA may overlap in the area of employment discrimination, their confluence must not be exaggerated. A plaintiff does not lose his right to an adjudication regarding the causes of action created by Title VII simply because the conduct of which he complains also offends section 8 of the NLRA." *Britt v. Grocers Supply Co., Inc.*, 978 F.2d 1441, 1447 n.9 (5th Cir. 1992). The plaintiffs did not, and could not, ask the NLRB to determine whether Title VII prohibited QuietFlex's decision to fire employees who had participated in the walkout. Claim preclusion does not bar plaintiffs' retaliation claim in this action.

Nor does issue preclusion apply to bar plaintiffs' retaliation claims. Defendants argue that they fired plaintiffs because they remained on defendants' property after being asked to leave. (Docket Entry No. 16 at 9). The NLRB's decision focuses on this element of a retaliation claim. The NLRB affirmed the administrative law judge's decision that the parties did engage in concerted activity protected under section 7 of the National Labor Relations Act when they began the work stoppage, but lost that protection by remaining on the property after they were repeatedly asked to leave.

Before the NLRB, the parties stipulated that the "employees were discharged for refusing to vacate [QuietFlex]'s property, and not for refusing to return to work, which would have been protected activity under § 7." *QuietFlex Mfg.*, 344 NLRB 130 at 1 n.1. "Generally speaking, when a particular fact is established not by judicial resolution but by stipulation of the parties, that fact has not been 'actually litigated' and thus is not a proper candidate for issue preclusion." *Otherson v. Dep't of Justice*, 711 F.2d 267, 274–75 (D.C. Cir. 1983); *see also U.S. v. Botefuhr*, 309 F.3d 1263, 1282 (10th Cir. 2002); *Kane v. Town Harpswell*, 254 F.3d 325, 329 (1st Cir. 2001); *In re Krug*, 102 B.R. 98,100 n.4 (Bkrtcy. W.D. Tex. 1989); *Envtl. Defense Fund, Inc. v. Alexander*, 467 F. Supp. 885, 904–05 (D.C. Miss. 1979).   Whether the employees were discharged for engaging in the work stoppage—rather than for refusing to leave the property—was not "actually litigated."   The record does not establish that plaintiffs would not have been fired had they left the premises when asked to do so, as discussed by this court in its June 24, 2002 memorandum and opinion. (Docket Entry No. 44 at 26).   The plaintiffs submitted declarations stating that management threatened to fire them, not only for remaining on the premises, but also if they did not return to work.  (Docket Entry No. 16, Ex. C, Casanova Decl. ¶ 15; Gonzalez Decl. ¶ 10).

Plaintiffs are not precluded from asserting that the discharge of protesting employees on January 10, 2000 was in retaliation for engaging in protected activity.   Defendants' motion for leave to file a motion for partial summary judgment is granted; the motion for partial

summary judgment on this issue is denied.  (Docket Entry Nos. 259, 260).

21

### III. Plaintiffs' Motion for Partial Summary Judgment that Defendants are an Integrated Enterprise

Goodman and QuietFlex were related companies that merged into one entity in April 2001. (Docket Entry No. 245, Ex. F). Plaintiffs move for partial summary judgment that Goodman and QuietFlex have operated as an integrated enterprise through the relevant period, which is presumably since October 1997. (Docket Entry No. 245). The parties do not distinguish between the relationship of Goodman and QuietFlex before and after the merger. Goodman previously moved for summary judgment that it was not, before its merger with QuietFlex, an "integrated enterprise" with QuietFlex. (Docket Entry No. 5). This court denied that motion as premature and to allow plaintiffs time for discovery into issues of internal corporate organization. (Docket Entry No. 44 at 30).[6]

Four factors determine whether two entities may be held liable as a joint employer: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Skidmore v. Precision Printing & Packaging Inc.*, 188 F.3d 606, 616 (5th Cir. 1999) (citing *Radio Union v. Broadcast Serv.*, 380 U.S. 255, 257 (1965)). "Traditionally, the second of these four factors has been considered the most important, such that courts have focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating

---

[6] The parties filed a joint motion to extend the deadline for deposition of a Rule 30(b)(6) witness on whether defendants are an "integrated enterprise." (Docket Entry No. 205). The parties asked this court to extend the deadline for taking the deposition of the Rule 30(b)(6) witness from March 4, 2005 to April 18, 2005. (*Id.*). Plaintiffs deposed defendants' Rule 30(b)(6) witness on the integrated enterprise issue on June 16, 2005. The joint motion is denied as moot.

to the person claiming discrimination?"   *Id.* at 617 (citing *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997)).   The determination is fact-intensive.  *Vance v. Union Planters Corp.*, 279 F.3d 295, 297 (5th Cir. 2002).  The relevant inquiry in this case is whether Goodman made the employment decisions the plaintiffs challenge.

A "strong presumption" exists that a parent corporation is not the employer of its subsidiary's employees.  "Only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary"—such as "domination similar to that which justifies piercing the corporate veil"—can overcome the presumption.  *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997).  The existence of common management and ownership and the "normal incidents" of a parent-subsidiary relationship, such as the parent's right to select directors and to set general policies, do not justify treating a parent and its subsidiary as a single employer.  *Id.*   "'Attention to detail,' not general oversight, is the hallmark of interrelated operations."  *Id.* (quoting *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 982 (4th Cir. 1987)).  Factors suggesting such interrelated operations include evidence that the parent: "(1) was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) shared employees, services, records, and equipment with the subsidiary; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) maintained the subsidiary's books; (5) issued the subsidiary's paychecks; or (6) prepared and filed the subsidiary's tax returns."  *Id.* at 981 n.1.  The existence of any of these factors is not dispositive.  *Id.*  The

23

court in *Lusk* clarified that "[s]ome nexus to the subsidiary's daily employment decisions must be shown."  *Id.*

Plaintiffs argue that the managers of QuietFlex's plant report to Goodman employees, evidencing a subordinate relationship.  (Docket Entry No. 245 at 6).  They cite Dan Daniel's testimony that he "reported" to the president of Goodman.  (Docket Entry No. 245 at 6).  Daniel, the QuietFlex president, testified that he "reported" to the Goodman president.  (Docket Entry No. 245, Ex. H).  The testimony does not show that, as a matter of law, Goodman was involved in more than "general oversight" over Daniel's role as president of QuietFlex.  *See Lusk*, 129 F.3d at 778.  Daniel testified that he "was responsible for the overall running of the company."  (Docket Entry No. 245, Ex. H at 12).  Wanda Ford, Goodman's human resources director, who was presented as Goodman's corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure, testified that if Don King, the executive vice-president of human resources at Goodman, wanted to change policies at QuietFlex, he would have to first consult QuietFlex management.  (Docket Entry No. 263, Ex. 1 at 64).  She also testified that, before Dan Daniel left QuietFlex in 2003, he "pretty much had the authority to do what he wanted out there."  (*Id.* at 67).

Plaintiffs point to the fact that Pete Crane, QuietFlex's former vice-president of manufacturing, was fired by Goodman  in 2002 and that QuietFlex employees reported to Goodman employees after Daniels's departure in 2003.  (Docket Entry No. 245 at 7).  Goodman and  QuietFlex merged in 2001; evidence as to the relationship between the two

after that merger is not relevant to whether they were an "integrated enterprise" before the merger.

Plaintiffs argue that human resources management of QuietFlex and Goodman attended meetings together, but this does not show more than a typical parent-subsidiary relationship. *Skidmore*, 188 F.3d at 617. Plaintiffs argue that Goodman managers participated in hiring, supervision, and firing of human resources personnel at QuietFlex. Ford testified that Cliff Reilly, the vice-president of Goodman Manufacturing from 1997 to 2001, "may have" made recommendations as to whether to hire a human resources manager at QuietFlex, but that Goodman employees would not have made the hiring decision. (Docket Entry No. 245, Ex. C at 13). Plaintiffs argue that QuietFlex's policies are developed by Goodman and that Goodman has the power to alter them. (Docket Entry No. 245 at 10–11). Ford testified that, from 1997 to 2003, Goodman would publish policies for the related entities to consider, but different entities "had a choice as to accept them and use them." (Docket Entry No. 263, Ex. 1 at 30). She testified that she "ha[d] no idea" whether QuietFlex used the same policy for transfers between Departments that Goodman used in May 1998 because "during that time [Goodman] was not involved in their transfers or decisions." (*Id.* at 34). Plaintiffs do not present or point to evidence that Goodman made any decisions regarding hiring, transferring, or firing employees in Departments 906, 910, or 911. They do not show that Goodman "made the final decisions regarding employment matters related to the person[s] claiming discrimination." *Schweitzer*, 104 F.3d at 764.

Plaintiffs allege that Goodman and QuietFlex shared human resources personnel who transfer between the companies.  Goodman's Rule 30(b)(6) witness testified that Goodman supplies a human resources employee to "step in to help out" when a QuietFlex manager is out.  (Docket Entry No. 263, Ex. 1 at 52).  "When there is a gap, when someone is out more than just a day or two and they want some back up, we will send someone who is available to assist them."  (*Id.*).  Goodman human resources personnel were "available" as a resource for QuietFlex human resources personnel.  "But the local personnel generally trained them, either the people on the HR staff there or their own management such as Dan Daniel [the former QuietFlex president] or anyone else in that capacity."  (Docket Entry No. 263, Ex. 1 at 53).  Plaintiffs do not allege or present summary judgment evidence that Goodman employees, while "filling in" for management at QuietFlex, made decisions relating to the proposed class.

Plaintiffs allege that Goodman performs numerous services for QuietFlex, that they share benefits, and that they share common ownership.  Goodman handled the 401k plan for QuietFlex employees.  (Docket Entry No. 263, Ex. 1 at 46).  Payroll for QuietFlex employees was calculated by QuietFlex, reviewed by Goodman employees, and the checks  created by the Goodman system.  (*Id.*).  There is a single benefits plan for employees of both Goodman and QuietFlex.  (*Id.*).  Plaintiffs cite testimony by Ford that Goodman pays QuietFlex's taxes and that reimbursement checks for QuietFlex employees are drawn on Goodman accounts.  (Docket Entry No. 245 at 20).  Ford  testified that Goodman has paid QuietFlex's taxes for the last two to three years, (Docket Entry No. 245, Ex. C at 97–98).  Ford did not testify

26

about the period before the 2001 merger. The evidence as to the payroll and other administrative services Goodman performed for QuietFlex before 2001 does not show that, as a matter of law, they were an integrated enterprise. In *Vance v. Union Planters Corp.*, 279 F.3d 295, 301–02 (5th Cir. 2002), the court noted that the district court had correctly determined that a parent and subsidiary were not an integrated enterprise even though the parent filed consolidated reports with the SEC and other federal agencies, filed consolidated tax returns, served as the centralized payroll entity, had Common Management Agreements executed and followed by its subsidiary, and owned 100% of its subsidiary's stock. The court in *Lusk* specified that common management and other normal incidents of a parent-subsidiary relationship do not overcome the strong presumption of separate entities. 129 F.3d at 778.

Defendants have shown, in light of the "totality of the facts" that there are disputed issues of fact material as to whether Goodman, before the 2001 merger, "excessively influenced or interfered with the business operations of [QuietFlex,] that is, whether the parent *actually exercised* a degree of control beyond that found in the typical parent-subsidiary relationship." *Lusk*, 129 F.3d at 778. Defendants have shown that there are disputed issues of material fact as to whether Goodman made "the final decisions regarding employment matters relating to the [proposed class]." *Skidmore*, 188 F.3d at 617. Plaintiffs' motion for summary judgment that the defendants were an integrated enterprise before Goodman's 2001 merger with QuietFlex is denied.

27

## III.    Plaintiffs' Motion for Class Certification[7]

### A.    The Claims for Relief

The named plaintiffs are five present and former QuietFlex employees who worked

in Department 911: Lazaro Garcia, Ector Lopez, Fernando Gonzalez, Miguel Hernandez-

Mendez, and Jose P. Aleman.  (Docket Entry No. 208 at 2).  Lazaro Garcia began working

---

[7]  Defendants move to dismiss nineteen claimants under Federal Rule of Civil Procedure 37(d) because of an inability to depose them.  (Docket Entry No. 215).  Defendants assert that Jose Santillan ignored a properly-served deposition notice; six claimants failed to appear for their scheduled depositions; and that defendants were unable to serve twelve defendants because the EEOC provided them incorrect contact information.  The EEOC and the plaintiffs have responded.  (Docket Entry Nos. 225, 227).

Federal Rule of Civil Procedure 37(d) provides, in relevant part:

If a party . . . fails (1) to appear before the officer who is to take the deposition, after being served with proper notice . . ., the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule.

FED. R. CIV. P. 37(d).  Subparagraph (C) of subdivision (b)(2) gives the court discretion to dismiss the action or any part thereof.  FED. R. CIV. P. 37(b)(2)(C).  Dismissal with prejudice is "a draconian remedy" and the "remedy of last resort" "[b]ecause the law favors the resolution of legal claims on the merits and because dismissal is a severe sanction that implicates due process . . . ."  *FDIC v. Conner*, 20 F.3d 1376, 1380 (5th Cir. 1994).  The Fifth Circuit has explained:  "[A]lthough the Supreme Court has admonished that the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, we are also instructed by our precedents that sanctions should not be used lightly, and should be used as a lethal weapon only under extreme circumstances."  *Id.*  (internal quotations omitted).  "When lesser sanctions have proved futile, a district court may properly dismiss a suit with prejudice."  *Hornbuckle v. Arco Oil & Gas Co.*, 732 F.2d 1233, 1237 (5th Cir. 1984).  The following factors "must be present before a district court may dismiss a case as a sanction for violating a discovery order": the refusal to comply must result from "willfulness or bad faith" and be "accompanied by a clear record of delay or contumacious conduct;" the violation of the discovery order must be attributable to the client instead of the attorney; the violating party's misconduct must substantially prejudice the opposing party; and the desired deterrent effect must not be able to be substantially achieved by a less drastic sanction.  *Conner*, 20 F.3d at 1380.

Defendants have deposed more than eighty individual plaintiffs in this suit.  (Docket Entry No. 215 at 2).  Defendants have not shown that any of the nineteen plaintiffs they have been unable to depose would likely offer new or different information.  Plaintiffs argue that the failures to respond to defendants' deposition requests are not the result of bad faith, but of the difficulty of obtaining correct current address information.  The motion to dismiss is denied at this time.  If, however, the case is not certified and these plaintiffs cannot be located or do not participate in the case, their claims will be dismissed.

at QuietFlex in June 1998 and currently works in Department 911.  (Tr. T. 1 at 34).  Ector

Lopez began working at QuietFlex in March 1995 and currently works in Department 911.

(Docket Entry No. 165, Ex. 4 at 9–11).  Fernando Gonzalez began working at QuietFlex in

1988 and now works in Department 911.  (Tr. T. I at 75).  Miguel Hernandez-Mendez began

working at QuietFlex in August  1999 and now works in Department 911.  (Docket Entry No.

208, Ex. 3 at 7).  Jose Aleman began working at QuietFlex in 1996 and is currently employed

in Department 906.  (Docket Entry No. 208, Ex. 2 at 9).[8]  They assert both disparate impact

and disparate treatment claims arising from specific employment policies and practices at the

QuietFlex Houston plant from October 1997 to the present, specifically in Departments 910,

911, and 906.

Plaintiffs challenge the following employment practices:  (1) hiring Latino workers

for Departments 911 and 906 but not for Department 910, instead hiring Vietnamese workers

for that department; (2) paying higher piece rates for Department 910 work that is essentially

the same as work performed in Departments 911 and 906, and imposing higher production

quota requirements on workers in Departments 911 and 906, so that employees in those

departments receive lower compensation; (3) requiring English-speaking ability, which was

---

[8]  Plaintiffs move to substitute the named representatives, asking that Fermin Colindres and Juan Casanova be removed and Miguel Hernandez-Mendez and Jose P. Aleman substituted as named class representatives.  (Docket Entry No. 208).  Defendants oppose the motion.  (Docket Entry No. 214).  Federal Rule of Civil Procedure 15(a) states that permission to amend a complaint "shall be freely given when justice so requires."  Defendants contend that the plaintiffs' proposed amendment would unduly prejudice them. Unlike the cases on which defendants rely, however, plaintiffs filed the motion to substitute named representative before briefing on the issue of class certification was complete.  Defendants filed their postargument supplemental brief opposing class certification three months after the motion to substitute named representatives.  (Docket Entry No. 236).  Defendants have already deposed the new class representatives.  No prejudice will result from the substitution.  The motion is granted.

subjectively measured, for hiring and transferring into Department 910, which prevented or deterred Department 911 and 906 employees from transferring into that department and perpetuated the segregated nature of the departments; (4) giving preference in transfers to employees with intradepartment seniority, which perpetuated the absence of Hispanic workers in Department 910; (4) providing inferior safety equipment and more dangerous and unpleasant working conditions in Departments 911 and 906 than in Department 910; (5) before January 2000, requiring Hispanic employees to perform cleaning and other menial tasks not required of Vietnamese employees; and (6) subjecting Hispanic employees, who primarily worked in Departments 911 and 906, to offensive and derogatory comments and actions.  In addition, the plaintiffs allege that by firing those employees who walked out on January 10, 2000 to protest the discriminatory conditions and policies, the defendants retaliated against them for activity protected under Title VII.

To establish intentionally discriminatory treatment on a classwide basis, plaintiffs must show a pattern and practice of disparate treatment.  Disparate treatment is based on section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), which provides that it is an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of impermissible factors, including race or national origin.  The *prima facie* elements of a claim for disparate treatment are:  (1) that the plaintiff is a member of a protected class under the statute; (2) that he applied and was qualified for a job or promotion for which his employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that afterwards the

position remained open, and the employer continued to look for candidates with plaintiff's qualifications.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Runnels v. Tex. Children's Hosp. Select Plan*, No. 04-20825, 2006 WL 189939, at *4 (5th Cir. Jan. 25, 2006).  A "pattern or practice" of discrimination by the employer requires a showing that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). Proving a pattern or practice is necessary to establish a *prima facie* case in a disparate treatment class action.  "Proving isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case. . . ." *Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 875–76 (1984).  The statute provides for compensatory and punitive damages for successful disparate treatment claims and grants both parties the right to demand a jury trial when such damages are sought in intentional discrimination claims.  *See* 42 U.S.C. § 1981a(c).

To establish a disparate impact claim, the plaintiffs must show that there is a specific, facially-neutral employment practice, that there is a statistically significant disparity among members of different groups affected by the practice, and that there is a causal nexus between the facially-neutral employment practice and the statistically significant disparity.  The disparate impact basis for Title VII liability is based on section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), which forbids an employer to "limit, segregate, or classify" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of race or sex.  Disparate impact claims, recognized in *Griggs v. Duke Power Co.*, 401 U.S.

424 (1971), do not require proof of intent to discriminate.  Plaintiffs must identify specific practices as responsible for the asserted disparities, *see Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1367 (5th Cir. 1992), and must present a systemic analysis of those employment practices to establish their case, *see Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 63 (5th Cir. 1990).  Once it is shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement (has) . . . a manifest relationship to the employment in question." *Dothard v. Rawlinson*, 433 U.S. 321 (1977).  If the employer proves that the challenged requirements are job-related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest . . . ." *Id.*; *see also Connecticut v. Teal*, 457 U.S. 440, 447 (1982) (stating that a Title VII plaintiff may still prevail after an employer-defendant's showing of business necessity "if he shows that the employer was using the practice as a mere pretext for discrimination"); *Int'l Bhd. of Elec. Workers, AFL-CIO, Local Unions Nos. 605 & 985 v. Miss. Power & Light Co.*, No. 04-60975, 2006 WL 508327, at *3 (5th Cir. 2006) (holding that the plaintiff has the burden of showing acceptable alternative employment practices, not the defendant).  Neither compensatory nor punitive damages is available for a disparate impact claim.  *See* 42 U.S.C. § 1981a(a)(1). There is no right to a jury trial as to a disparate impact claim, with the important exception of factual issues necessary also to determine liability on a pattern or practice discriminatory treatment claim.  *See Allison*, 151 F.3d at 423.

    In this case, the plaintiffs challenge the same employment policies and practices under

both a disparate impact and a disparate treatment claim.  For example, the English-language requirement and intradepartment seniority policies are challenged under a disparate impact claim, as allegedly facially-neutral policies uniformly applied to the workforce with discriminatory results for Latinos.  *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32 (1971) (requiring a high school education or standardized intelligence test as a condition of employment negatively resulted in a disparate impact on minorities and was prohibited because the standard was unnecessary for successful job performance); *Maldonado v. City of Altus*, 433 F.3d 1294, 1303 (10th Cir. 2006) (Hispanic employees challenged city's English-only policy under disparate impact theory); *Stephen v. PGA Sheraton Resort, Ltd.*, 873 F.2d 276, 279–80 (11th Cir. 1989) (Haitian man challenged English-language requirement under disparate impact theory); *EEOC v. Premier Operator Servs., Inc.*, 113 F. Supp. 2d 1066, 1069–74 (N.D. Tex. 2000) (Hispanic employees successfully challenged employer's "English only" policy under both disparate impact and disparate treatment theories of discrimination).  Plaintiffs also allege that these policies were not uniformly applied to the workplace, but applied in a discriminatory manner to disadvantage Latinos; the disparate treatment claim applies as well.

To remedy the alleged discrimination, the plaintiffs initially sought every available form of injunctive, declaratory, and monetary relief for the class.  (Docket Entry No. 55 ¶ 109).  The plaintiffs have withdrawn their request for class certification of the compensatory damages claim, recognizing that circuit precedent views such claims as too individualized

for class treatment.[9] The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not classwide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards.  By requiring individualized proof of discrimination and actual injury to each class member, compensatory damages introduce new and substantial legal and factual issues. *Allison*, 151 F.3d at 417.  Although the plaintiffs have withdrawn their request for certification of a class seeking compensatory damages, they continue to seek punitive damages on a classwide basis.

In terms of affirmative injunctive relief, the plaintiffs seek restructuring of the policies relating to hiring and transfer into Department 910 to remove the allegedly discriminatory English-language requirement and the preference given to intradepartment seniority.  The plaintiffs apparently also seek injunctive relief with respect to differentials between piece rates in Department 910 and Department 911, at the same time assuring this court that no more is required than an order requiring that equivalent work be paid on an equivalent piece rate basis.  The plaintiffs seek back pay on a classwide basis, recognized in this circuit as a

---

[9]  In their March 2, 2005 brief, a reply to defendants' response to the class certification motion, plaintiffs said for the first time—in a footnote—that they "are willing to amend their complaint to reflect that, for purposes of class certification, Plaintiffs do not seek individual compensatory damages.  In the case that the class is not certified, however, Plaintiffs intend to seek compensatory damages in their individual capacity in the *Aleman* action."  (Docket Entry No. 202 at 4 n.3).  Defendants responded to this argument in their postargument supplemental brief.  (Docket Entry No. 236).  Plaintiffs filed a motion to strike that portion of the brief, arguing that it was filed outside the briefing schedule.  (Docket Entry No. 240).  In the alternative, plaintiffs requested 45 days to submit a response to the argument.  (*Id.* at 6).  Both sides have addressed the class certification issues raised by the withdrawal of  compensatory damages.   Plaintiffs' motion to strike and alternate motion for leave to file a response are denied.  Defendants' motion to refile their postargument supplemental brief, (Docket Entry No. 243), is denied as moot.

form of equitable relief rather than as compensatory monetary damages.  *Monumental Life*,

365 F.3d at 418.

> The plaintiffs define the proposed class as follows:
>
> All current and former Latino employees who worked in Departments 911 and 906 at any time during October 10, 1997 to the present and who were subjected to Defendant's discriminatory policies and practices.

Plaintiffs also seek certification of two subclasses:

> 1.  All current and former Latino employees who worked in Departments 911 and 906 at any time during October 10, 1997 to the present and who were subjected to Defendant's discriminatory policies and practices and who will not seek back pay for work not performed.
>
> 2.  All current and former Latino employees who were fired by the Company on or about January 10, 2000 after a group of class members complained about discriminatory conditions at the QuietFlex facility.

(Docket Entry No. 188 at 6).

The proposed class definition is flawed in one respect.  A class definition must be

"precise, objective, and presently ascertainable."  MANUAL FOR COMPLEX LITIGATION §

21.222 at 270 (4th ed. 2005).  A class definition should not use terms that depend on

resolving the claims on the merits.  The plaintiffs' proposed definition does precisely that by

defining the class as those subjected to discriminatory practices.  It is clear, however, that

because the plaintiffs allege that all Latinos in Departments 911 and 906 were subjected to

the challenged employment practices, the proposed class definitions are in effect:  "all

current and former Latino employees who worked in Departments 911 and 906 from October

10, 1997 to the present who will seek back pay for work not performed"; "all current and

former Latino employees who worked in Departments 911 and 906 from October 10, 1997

35

to the present who will not seek back pay for work not performed"; and "all current and former Latino employees who were fired by QuietFlex on or about January 10, 2000 after a group of class members complained about discriminatory conditions at the QuietFlex facility."

Plaintiffs ask this court to bifurcate the trial of the case into liability and relief phases. (Docket Entry No. 81 at 22). Plaintiffs propose that in Stage I, they will try general issues of classwide liability and entitlement to classwide relief to a jury. Plaintiffs include injunctive and declaratory relief and classwide punitive damages in this stage. (*Id.* at 22–23). They also propose that the jury would determine the "aggregate amount of lost earnings owed to the class and a measurement of front pay" during Stage I. (*Id.* at 28). Plaintiffs propose that, if they prevail in Stage I, individual equitable relief—the amount of back pay that each plaintiff receives— would be determined by the court in Stage II. (*Id.* at 23, 29).

Defendants argue that plaintiffs' proposed class is too small to satisfy numerosity. (Docket Entry No. 116 at 4). They argue that plaintiffs do not satisfy commonality or typicality because plaintiffs' disparate treatment claims are too individualized, are subject to unique, individualized defenses as to why they were denied transfers, and differ in their length of employment with QuietFlex. (*Id.* at 4–5). Defendants argue that changes at QuietFlex over the relevant period further negate commonality and typicality. (Tr. T. I at 54). Defendants argue that, to the extent the named plaintiffs forego compensatory damages to achieve class certification, they fail adequately to represent the interests of the other class members. (Docket Entry No. 236 at 14). Defendants argue that

certification under Federal Rule of Civil Procedure 23(b)(2) is inappropriate because a majority of the proposed class no longer works at QuietFlex and would not benefit from injunctive relief and because a majority of new entrants into Department 910 are Hispanic, making injunctive relief unnecessary. Defendants argue that certification under Rule 23(b)(2) or 23(b)(3) is inappropriate because punitive damages cannot be assessed without highly individualized assessments of harm to individual plaintiffs.  (Docket Entry No. 236 at 11–14).  Defendants also argue that the plaintiffs' trial plan is unconstitutional insofar as it allows an award of punitive damages before assessing whether and how individual plaintiffs have been harmed.  (Docket Entry No. 116 at 47).  Defendants argue that back pay also cannot be calculated without individualized inquiry because the piece rate system varies from individual to individual and job task to job task.  (Docket Entry No. 236 at 3–11). Defendants argue that an individual's productivity in Department 911 is not a proxy for his productivity in Department 910.  (Docket Entry No. 207, Ex. A).  Defendants also argue that the EEOC's intervention in this suit makes class certification under Rule 23 unnecessary. (Docket Entry No. 236 at 15).

These arguments are examined below.

### B.      Class Certification Standards: Rule 23 and *Allison v. Citgo Petroleum*

To certify a class under Rule 23, plaintiffs must show that their proposed class meets all of the requirements of Rule 23(a) and the requirements of at least one of the subsections of Rule 23(b).  A district court has substantial discretion in determining whether to certify a class. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998).  Before

37

granting certification, a court must conduct a rigorous analysis to determine whether the plaintiffs have met the Rule 23 requirements. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano*, 84 F.3d at 744. The parties have presented a great deal of evidence that bears on the merits of the plaintiffs' claims and the defenses to those claims, which is common in Rule 23 certification motions. Courts have noted that determining class action certification issues requires examining evidence that is intertwined with the merits of the claims. *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311–12 (5th Cir. 2005); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675–76 (7th Cir. 2001). The issue on a certification motion is not whether the plaintiffs will ultimately prevail on the merits of their claims, or the strengths and weaknesses of the evidence as to the defenses. Rather, the court must examine the nature of the evidence that will be used to establish the claims and the defenses, to determine whether that evidence can be presented on a classwide basis. FED. R. CIV. P. 23(c)(1) Committee Note (2003). The party seeking certification bears the burden of showing that the Rule 23 requirements are satisfied. *Allison*, 151 F.3d at 408; *Castano*, 84 F.3d at 740.

In *Allison*, the Fifth Circuit reviewed the use of class actions in eradicating "widespread or institutional-scale discrimination" in the employment context, primarily based on disparate impact challenges to facially-neutral policies that result in racial disparities when uniformly applied to a workforce, and to pattern or practice claims of

38

intentional discrimination.  *Allison*, 151 F.3d at 409.  As the court pointed out in *Allison*, the 1991 amendments to the Civil Rights Act dramatically changed the use of class actions as a way to address employment discrimination by providing for the recovery of compensatory and punitive damages in cases of intentional discrimination and allowing jury trials in such cases.  *Id.* at 409–10; 42 U.S.C. § 1981a(a)(1) and (c).  In *Allison*, the court noted that providing for monetary claims other than back pay and for jury trials "introduced, in the context of class actions, potential manageability problems."  151 F.3d at 410.  These changes also affected the use of class actions in disparate impact cases.  The Seventh Amendment requires submission to a jury of all factual issues common to legal and equitable claims, for determination of the legal claims, before a final court decision regarding the equitable claims.  *See Roscello v. Sw Airlines Co.*, 726 F.2d 217, 221 (5th Cir. 1984) (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962)).  The right to a jury trial extends to all factual issues necessary to determine liability on the pattern or practice claim and the amount of compensatory or punitive damages.  Plaintiffs' disparate treatment and disparate impact claims and their remedy requests are often inseparable.  *See Smith v. Texaco, Inc.*, 263 F.3d 394, 413–14 (5th Cir. 2001) (opinion withdrawn) (discussing inseparability of the different types of claims and remedies available under Title VII).

In *Allison*, the Fifth Circuit also addressed the problems with certifying an employment discrimination class action that seeks compensatory or punitive damages.  151 F.3d 402.  The court denied certification of a class of more than 1,000 black employees and applicants for employment who alleged discrimination in hiring, promotion, compensation,

and training policies.  Plaintiffs claimed both disparate impact and disparate treatment discrimination.  They sought injunctive relief, back pay, front pay, compensatory and punitive damages, and attorneys' fees.  The court held that monetary damages predominated over the injunctive relief that plaintiffs sought, precluding certification under Rule 23(b)(2), because the compensatory and punitive damages required individualized proof of injury for each class member.  The court also denied certification under Rule 23(b)(3) because individualized determinations required for compensatory and punitive damages meant that class issues did not predominate and that class treatment was not a superior method for resolving the claims. The court specifically rejected the possibility of a "hybrid" class with injunctive relief under Rule 23(b)(2) and damages relief under Rule 23(b)(3).  *Id.* at 419.

*Allison*'s rejection of a hybrid employment-discrimination class action that would permit both injunctive and damages relief has been adopted by some circuits.  *See Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000); *Murray v. Auslander*, 244 F.3d 807 (11th Cir. 2001).  The Second Circuit, in *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001), rejected *Allison*'s limit of (b)(2) certification to claims involving no more than incidental monetary damages, instead adopting an "ad hoc balancing that will vary from case to case." *Id.* at 164.  Most recently, the Sixth Circuit analyzed the certification of Title VII cases in *Reeb v. Ohio Dept. of Rehabilitation & Correction*, No. 04-3994, 2006 WL 162836 (6th Cir. Jan. 24, 2006), and adopted a position similar to, but more stringent than, the Fifth Circuit.  In *Reeb*, the court noted that Title VII individual compensatory damages typically involve individualized loss

calculations, including "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." *Id.* at *11.  The court also noted that, in a Title VII case, "whether the discriminatory practice actually was responsible for the individual class member's harm, the applicability of nondiscriminatory reasons for the action, showings of pretext, and any affirmative defense of all must be analyzed on an individual basis." *Id.* at *12.  Because Title VII provides for fee-shifting, provides administrative remedies, and allows the EEOC to bring suit on an individual's behalf, a court need not allow class certification to preserve Title VII claims that would otherwise not be brought. *Id.*  The court held that "the claims for individual compensatory damages of members of a Title VII class necessarily predominate over requested declaratory or injunctive relief, and individual compensatory damages are not recoverable by a Rule 23(b)(2) class. . . . Plaintiffs now have the choice of proceeding under Rule 23(b)(3) in an action for money damages or in an action under Rule 23(b)(2) for declaratory or injunctive relief alone or in conjunction with compensatory and punitive damages that inure to the group benefit." *Id.*  While *Allison* allowed for certification under Rule 23(b)(2) of Title VII cases that seek monetary damages in limited circumstances—when the damages are "incidental" to the requested injunctive relief—*Reeb* excludes the possibility of seeking monetary damages in a Title VII case under Rule 23(b)(2), instead requiring plaintiffs to either forego monetary damages or meet the more stringent requirements of Rule 23(b)(3).

Few employment discrimination class actions have been certified in the Fifth Circuit since *Allison*.  Most of the reported employment discrimination cases in which class

certification has been sought since *Allison* have not resulted in class treatment.[10]  There are

_____

[10] *See, e.g.*, *Swanson v. Perry*, 69 Fed. Appx. 658 (5th Cir. 2003) (unpublished opinion) (affirming a denial of class certification for a group of African-American employees who brought Title VII employment discrimination suit, seeking certification under Rule 23(b)(2) for claims for declaratory relief, injunctive relief, back pay, bonuses, and compensatory damages, holding  that the employees failed to demonstrate commonality and typicality under Rule 23(a) and  that the claims for injunctive and declaratory relief did not predominate over the  compensatory damage claims, which required individualized determinations); *Smith v. Texaco, Inc.*, 263 F.3d 394 (5th Cir. 2001) (opinion withdrawn) (denying certification of race discrimination suit brought by approximately 200 salaried black employees who sought  compensatory and punitive damages and back pay and holding that the class could not be certified under Rule 23(b)(2) because compensatory and punitive damages predominated over injunctive and declaratory relief and could not be certified under Rule 23(b)(3) because the claims for punitive damages required individual inquiries); *Lumpkin v. Coca-Cola Bottling Co. United, Inc.*, 216 F.R.D. 380 (S.D. Miss. 2003) (denying certification of suit by African-American employees alleging disparate impact and disparate treatment and holding that many of the proposed class members' claims were barred by limitations, and those members whose claims were timely were not sufficiently numerous to justify a class action); *Broadus v. Aegis Commc'n Group, Inc.*, No. 01-1777, 2002 WL 1371214 (N.D. Tex. June 20, 2002) (unpublished opinion) (holding that African-American *pro se* plaintiff who alleged employment discrimination failed to demonstrate numerosity, commonality, typicality, or that he could adequately represent the interests of the proposed class); *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592 (E.D. La. 2002) (denying Rule 23(b)(3) certification of class of approximately 100,000 employees who alleged breach of contractual agreements to provide rest and meal breaks and required them to work off-the-clock, despite the fact that the class of approximately sought only damages for lost wages and missed breaks, not compensatory or punitive damages and holding that  the success of individual class members' claims would turn on the special circumstances of each individual's case and that individual issues, such as why an employee might have worked off-the-clock or missed a break, would predominate); *Vance v. City of Nacogdoches, Tex.*, 198 F. Supp.2d 858 (E.D. Tex. 2002) (denying certification of a class  alleging disparate impact Title VII claims and expressed concern that the class representatives were not pursuing the full measure of damages available, which could have "potential preclusive effect on individuals who fail to opt-out"); *Street v. Diamond Offshore Drilling*, No. 00-1317, 2001 WL 568111 (E.D. La. May 25, 2001) (unpublished opinion)(denying Rule 23(b)(2) certification in disability discrimination case in which plaintiffs sought compensatory damages, punitive damages, back pay, and injunctive relief because the compensatory damages claims predominated over the claims for injunctive relief and because the punitive damages claim was "dependent on a non-incidental compensatory damages award" because punitive damages cannot be awarded "merely upon a finding that a defendant engaged in a pattern or practice of discrimination" and finding certification under Rule 23(b)(3) improper because individual issues predominated the action); *Burrell v. Crown Central Petroleum, Inc.*, 197 F.R.D. 284 (E.D. Tex. 2000) (denying 23(b)(2) certification of race and sex discrimination claims because money damages predominated over injunctive or declaratory relief and denied certification under 23(b)(3) because the need for individualized damages determinations caused individual issues to predominate over common ones); *Riley v. Compucom Sys., Inc.*, No. 98-1876, 2000 WL 343189 (N.D. Tex. March 31, 2000) (unpublished opinion) (denying certification of African-American employees' race discrimination and retaliation claims, holding that the plaintiffs did not demonstrate commonality or typicality under Rule 23(a) because, even if defendants maintained discriminatory policies and practices, those policies and practices adversely impacted each class member in different ways, that plaintiffs failed to show that they would adequately represent the class because of the "unavoidable factual disparities that will necessarily impact the success or failure of each Plaintiff's claims," and that plaintiffs' claims for compensatory and punitive damages precluded certification under either Rule 23(b)(2) or (b)(3) after *Allison*.); *Bourdais v. City of New Orleans*, No. 99-1434, 1999 WL 729249

three reported employment discrimination cases in **this circuit in which class certification has been granted since** *Allison*. **In** *Munoz v. Orr*, **200 F.3d 291 (5th Cir. 2000), Hispanic male civilian employees at an Air Force base alleged that** the promotion system  had a disparate impact, violating Title VII.  The district court certified the class under Rule 23(b)(2).  The Court of Appeals did not consider whether certification had been proper.  The case was filed in 1985 and certified before 1993.  *See* Br. of **Pet., at 4–6,** *Munoz v. Aldridge*, **No. 99-1750 (U.S. May 03, 2000).** *Allison* **did not apply to the class certification decision.  In** *San Antonio Hispanic Police Officers' Organization v. San Antonio*, **188 F.R.D. 433 (W.D. Tex. 1999), a court granted class certification under Rule 23(b)(2) for settlement purposes only.** *Id.* **at 441.  The plaintiffs in that case, Hispanic police officers, sought only injunctive and declaratory relief.** *Id.* **at 445.  Neither of these cases is helpful in resolving the issues raised**

---

(E.D. La. Sept. 15, 1999) (unpublished opinion) (denying certification of class of forty to fifty white applicants to the New Orleans Fire Department who challenged the  use of racial quotas in hiring because joinder of the forty to fifty applicants of the potential class was not impractical nor unfeasible and because the Department had terminated its use of racial quotas in hiring, so the issue would predominantly be what damages the plaintiffs suffered as a result of the former hiring practices); *Troupe v. Randall's Food & Drug, Inc.*, No. 98-2462, 1999 WL 552727 (N.D. Tex. July 28, 1999) (unpublished opinion) (denying certification of a class of African-American employees and former employees of Dallas/Fort Worth area supermarket chain, holding that plaintiffs failed to meet commonality and typicality requirements by not demonstrating with specificity a policy of discrimination by the defendants and how that policy would affect every member of the proposed class); *Zachery v. Texaco Exploration & Prod., Inc.*, 185 F.R.D. 230 (W.D. Tex. 1999) (denying certification of class of  African-American hourly field workers for an oil company, holding that class did not meet Rule 23(a) commonality and typicality requirements because plaintiffs held a variety of different jobs at different locations under different management and that class did not meet requirement of adequate representation because class representatives chose to drop their compensatory and punitive damages claims to aid the certification of injunctive claims after *Allison*); *Adams v. Brookshire Grocery Co.*, No. 98-0462, 1999 WL 33134344 (E.D. La. Feb. 10, 1999) (unpublished opinion) (denying certification of class of females who represented current and former employees of and applicants for employment with a grocery chain and holding that the compensatory and punitive damages plaintiffs sought were not incidental to the requested injunctive or declaratory relief, that bifurcating liability and damages claims would destroy the efficiency of the class action device, and that the compensatory and punitive damages made the issues in the case "individual-specific").

in the present suit.

In *McClain v. Lufkin Industries, Inc.*, **187 F.R.D.** 267 (E.D. Tex. 1999), African-American employees sued under Title VII and Section 1981, alleging disparate impact from employer's policy of granting unfettered discretion to its managerial employees in making employment decisions and sought certification under Rule 23(b)(2). *Id.* at 277. Plaintiffs sought compensatory and punitive damages individually, not on behalf of the class. *Id.* at 282. The court severed plaintiffs' individual monetary claims from their class claims for injunctive relief to insure that injunctive relief predominated and certified the class under Rule 23(b)(2). *Id.* The court did not examine claim splitting or preclusion issues. The case was not appealed.

Against this backdrop, this court examines whether the plaintiffs' proposed classes meet all the Rule 23(a) and either the Rule 23(b)(2) or (b)(3) requirements.

### B. Rule 23(a)

#### 1. Numerosity

A class must be so numerous that "joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The plaintiffs' proposed class includes "all Latino employees who worked for any period of time between January 1, 1996 to the present." (Docket Entry No. 81 at 14). Imperfect employment records have suggested a variety of numbers of potential class members, but plaintiffs need not provide a precise number of potential class members to meet the numerosity requirement. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 415 (5th Cir. 2004) (certifying class "although exact number of class members continuing to pay

discriminatory premiums was unknown"); *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983).

There are at least 196 Latino employees who worked in Department 911 from 1999 to 2002.  Plaintiffs have presented evidence that the number of Latino employees in Departments 911 and 906 during the proposed class period is approximately 330.  The Fifth Circuit has suggested that "any class consisting of more than forty members 'should raise a presumption that joinder is impracticable.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (quoting 1 NEWBERG, CLASS ACTIONS § 3.05 at 3-25 (3d ed. 1992)).

Defendants argue that the class should be limited to 33, the number of Latino employees assigned to Department 911 during the proposed class period who sought to transfer to Department 910 by signing a transfer posting form.  This argument is unpersuasive in light of the plaintiffs' argument and evidence that many Latino employees in Departments 911 and 906 were deterred from seeking transfer to Department 910 because of the allegedly discriminatory language requirement.   As this court noted in the May 21, 2004 Memorandum & Opinion,  (Docket Entry No. 151 at 23), Department 911 employees need not have signed job postings for Department 910 to claim that defendants' transfer policy was discriminatory.  The argument also ignores the allegations of other discriminatory practices.

The plaintiffs also presented evidence that joinder would be impracticable because "these are low-wage workers who tend to change jobs and addresses with frequency . . . ." (Docket Entry No. 81 at 15). The EEOC has had problems contacting many former

employees of Departments 911 and 906, who apparently no longer live at the last address available to QuietFlex.  (Docket Entry No. 188 at 13).  Absent members of the proposed class are dispersed, living in states that include Washington, California, Wisconsin, Oklahoma, and Texas.  (Docket Entry No. 202 at 41).  In *Mullen*, the Fifth Circuit noted that the fact that some of the "putative class members were geographically dispersed and unavailable for joinder" supported a numerosity finding. 186 F.2d at 624.  The "ease of identifying [ ] members and determining their addresses" and the "facility of making service on them" also affect the practicality of joinder.  *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980). The present record as to the number of Latino employees during the proposed class period, geographic dispersion, and the practical difficulties of locating them, meets the numerosity requirement of Rule 23(a).

### 2.    *Commonality*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." The threshold for commonality is not high; it is met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).  The absent class members' interests need not be identical to meet the commonality requirement. *Johnson v. Am. Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir. 1978); 7A CHARLES ALAN WRIGHT ARTHUR R. MILLER & MARY KAY KANE, FED. PRACTICE & PROCEDURE §1763 (3d ed. 2005).

The plaintiffs allege numerous issues, the resolution of which would affect the members of the proposed class, including whether defendants excluded Latinos from

46

Department 910 and instead channeled them into Departments 911 and 906, where the work was harder, more dangerous, and paid less; whether defendants used higher piece work rates for unskilled labor in Department 910 than for similar work in Department 911; whether defendants maintain an English-language fluency requirement for Latinos seeking to work in or transfer to Department 910; whether defendants provided inferior working conditions and safety equipment for Departments 911 and 906 as compared to Department 910; whether defendants required Latino employees in Departments 911 and 906 to perform menial labor not demanded of Vietnamese employees in Department 910, such as cleaning bathrooms and lunch rooms; and whether defendants retaliated against the plaintiffs by firing protesting workers on January 10, 2000.  Because "predominance obviously is a more stringent standard than that prescribed by Rule 23(a)(2)," the finding of commonality under Rule 23(a)(2) does not equate to a finding that the common issues  predominate under Rule 23(b)(3).  WRIGHT, MILLER & KANE at § 1763.

### 3. *Typicality*

Typicality requires plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  FED. R. CIV. P. 23(a)(3).  Like commonality, the threshold for demonstrating typicality is low.  *Lightbourn*, 118 F.3d at 426.  Typicality does not require identity of claims, but only that "the class representative's claims have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."  *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001).

47

The plaintiffs assert that "the typicality requirement is met because the named plaintiffs have suffered from the same discriminatory employment practices as the rest of the proposed class." (Docket Entry No. 81 at 16). The plaintiffs allege that the named class representatives and proposed class members were "channeled" into Department 911 or 906; were deterred from transferring into Department 910 through the language requirement and the intradepartment seniority requirements; were paid less for comparable work; were subjected to more dangerous working conditions with inferior safety equipment to that provided in Department 910; were forced to clean the bathrooms and cafeteria; and were "inspected" by having supervisors stomp on their feet. (Docket Entry No. 188 at 22).

Some of the proposed class members may not have experienced some of the alleged policies and practices. The evidence shows that the challenged employment practices changed over time, although the extent and nature of some of the changes is disputed. It is undisputed that after January 2000, the employees did not clean bathrooms or the cafeteria. (Tr. T. I at 54, ll. 17–21). It is undisputed that some of the supervisors who were allegedly derogatory in their treatment of Department 911 employees left the plant after January 2000. The work in Department 911 has become more automated over time, affecting allegations that deal with piece work pay rates, working conditions, and job safety. These variations bear on predominance, superiority, and manageability under Rule 23(b)(3), but do not defeat typicality under Rule 23(a). *See, e.g.*, *Smith*, 263 F.3d 394, 407 ("The class purports to consist of similarly-situated black employees who were exposed to the same policies. That the time period of exposure may differ, or that some were less affected by the policy, would

48

not necessarily prevent a finding of typicality.  It might, however, affect other considerations, such as damage levels or predominance."); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (holding that variety among the illnesses that class members suffered did not defeat typicality because class members' legal theories were the same); *Allison*, 151 F.3d at 407, 425–26 (holding that class satisfied typicality requirement but that certification was nonetheless improper under Rule 23(b)(2) or 23(b)(3)).

### 4.    *Adequate Representation*

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  This requirement "mandates an inquiry into (1) the zeal and competence of the representatives' counsel and (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees."  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citations omitted).  The competence of class counsel is not challenged.

Differences between named plaintiffs and absent class members make named plaintiffs inadequate representatives only if those differences create a conflict of interest between the named plaintiffs and the class members.  *Jenkins*, 782 F.2d at 472.  The defendants challenge the adequacy of representation because some of the proposed class members are supervisors.  The potential conflict is greatest when one class member has, as supervisor, evaluated another class member who now challenges the evaluation system.  This type of challenge is ineffective if both promotional and hiring discrimination are alleged, *see Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir. 1986), and does not defeat adequacy

49

under Rule 23(a) in this case.

The named plaintiffs have agreed to forego compensatory damages on a classwide basis to increase the likelihood of class certification. The plaintiffs ask this court to grant class certification as to the claims for an injunction and declaratory judgment, back pay, and punitive damages based on the disparate impact, disparate treatment, and retaliation claims, and not to seek compensatory damages in this class action.  (Docket Entry No. 202 at 4). Plaintiffs plan to pursue compensatory damages in individual actions if this court denies class certification. (*Id.* at n.3).

The implications of this approach for the Rule 23(b) requirements are analyzed below, but the decision also affects Rule 23(a)(4).  A decision not to pursue claims for compensatory damages in a class action may waive that claim on behalf of the individual class members. **As a general rule, the decision in a class action is binding on the parties in subsequent decisions.** *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984).  "Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply.  A judgment in favor of the plaintiff class extinguishes their claim, which merges into the judgment granting relief."  *Id.*  If the plaintiffs prevail in their proposed class action, the court may not award compensatory relief because the plaintiffs have chosen not to seek it.  The preclusive effect of the class action could prevent class members from seeking those damages in an individual lawsuit.  *Smith*, 407 F.3d at 386; *Allison*, 151 F.3d at 425 (citing *Roscello*, 726 F.2d at 221); *Martin*, 945 F.2d at 1003.

In *Murray v. GMAC Mortgage Corp.*, No. 05-8035, 2006 WL 90081 (7th Cir. Jan. 17,

2006), the court held that a representative plaintiff's decision to seek statutory but not compensatory damages did not defeat certification, but the court clarified that the compensatory damages at issue, "if any, [were] likely to be small" and hard to quantify. *Id.* at * 3. The court noted that a representative plaintiff should be allowed to forego claims for compensatory damages to achieve class certification "[u]nless a district court finds that personal injuries are large in relation to statutory damages." *Id.* In the present case, the plaintiffs have not argued that the damages to which individual class members might otherwise be entitled are insignificant. The 1991 Civil Rights Act allows damages up to $300,000 per plaintiff. Other courts have found class representatives who are willing to risk waiving absent class members' compensatory damages inadequate under Rule 23(a)(4). *See, e.g.*, *Zachery*, 185 F.R.D. at 243 ("[T]he named Plaintiffs are asking the class members being represented here to risk waiving their right to monetary damages solely so the action for disparate treatment can proceed as a class action. . . . [T]he Court is unwilling to risk this result. The decision by the named Plaintiffs to drop the monetary damages claim cannot be imposed upon the absent class members without raising a very serious conflict of interest. This conflict prevents certification of the proposed class for the claims as stated."); *Miller*, 202 F.R.D. at 203 (D. Md. 2001) (refusing to allow plaintiffs to amend complaint to remove claim for damages because "the proposed removal of the compensatory and punitive damages claims raises serious questions regarding the ability of the named plaintiffs to represent the putative class adequately").

Courts have also noted that eschewing compensatory damages may create a conflict

between the interests of present and past employees because former employees likely have less interest in declaratory or injunctive relief (although they do have an interest in back pay) than in compensatory damages. In *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004), the court noted that "to many of the class members (and especially to those who no longer work for the defendants), the monetary damages requested might be of far greater significance than injunctive relief, stated at a high order of abstraction, that simply directs the defendants not to discriminate." 390 F.3d at 721; *see also Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978, 979 (5th Cir. 2000) (when most of the class consisted of individuals who did not face further harm from the defendant's actions, court held that plaintiffs had "nothing to gain from an injunction" and that certification under Rule 23(b)(2) was an abuse of discretion).

A majority of the putative class members in this case are former employees, many of whom worked for a short period. (Docket Entry No. 194, Ex. 2). Plaintiffs argue that their claims for injunctive and declaratory relief would "achieve significant long-term relief" for "not only current class members, but all future Latino employees as well." (Docket Entry No. 202 at 3). Courts historically have used this justification to certify small classes, not to address concerns over adequacy of representation. *See, e.g., Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975) ("Smaller classes are less objectionable where, as in the case before us, the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members."). Plaintiffs cite *Young v. Pierce*, 544 F. Supp. 1010 (D.C. Tex. 1982), but that court was justifying certification of a smaller class: "For purposes of

establishing numerosity, smaller classes are more readily certified when the relief sought is injunctive relief, the benefits of which would inure not only to the known class, but also to a future class of indefinite size." *Id.* at 1028. *Young* does not justify certifying a case in which representative plaintiffs offer to forego compensatory damages despite the fact that the majority of the potential class members would only be benefitted by damages.

Plaintiffs suggest providing notice and opt-out rights to class members to protect the interests of those who want to pursue individual claims for damages. (Docket Entry No. 81 at 25–26). Rule 23(d)(2) allows district courts to provide notice and an opportunity to opt-out in a class action certified under Rule 23(b)(2) as well as in cases certified under Rule 23(b)(3). The Fifth Circuit "requires that notice be provided where a rule 23(b)(2) class seeks damages" to satisfy due process requirements. *Monumental Life*, 365 F.3d at 417 n.15. "[S]uch safeguards are most appropriate where individual issues diminish class cohesiveness. Then, conflicts among class members and issues of adequate representation are most likely to surface." *Id.* at 417. Providing class members notice and an opt-out opportunity may alert class members that they can pursue individual damages claims, but are not a substitute for the adequate, conflict-free representation required under Rule 23(a)(4).

### C.     Certification under Rule 23(b)

#### 1.     Rule 23(b)(2)

Rule 23(b)(2) permits certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

FED. R. CIV. P. 23(b)(2).  Rule 23(b)(2) classes must be cohesive.  *See James*, 254 F.3d at

571–72.  When a class suffers from a common injury and seeks classwide relief, there is a

presumption of cohesion.  *Allison*, 151 F.3d at 413.  In contrast, when a class seeks monetary

relief, the class becomes less cohesive because assessing those damages often requires

examination of individual claims.  *Id.*

        Plaintiffs seek both equitable relief, including back pay, and classwide punitive

damages.  Certification under  Rule 23(b)(2) is not proper in "cases in which the appropriate

final relief relates exclusively or predominantly to money damages."  FED. R. CIV. P. 23(b)(2)

Committee Note (1966).  Rule 23(b)(2) does not preclude plaintiffs from seeking monetary

damages if the predominant relief sought is equitable.  The Fifth Circuit has held that

monetary relief predominates in Rule 23(b)(2) class actions "unless it is incidental to

requested injunctive or declaratory relief."  *Allison*, 151 F.3d at 412.  Incidental damages are

those that "flow directly from liability to the class *as a whole* on the claims forming the basis

of the injunctive or declaratory relief."  *Id.* at 415 (emphasis in original).  Such damages are

those to which "class members automatically would be entitled once liability to the class (or

subclass) as a whole is established," such as a statutorily-mandated damages award.  *Id*.

Incidental damages must also be "capable of computation by means of objective standards

and not dependent in any significant way on the intangible, subjective differences of each

class member's circumstances."  *Monumental Life*, 365 F.3d at 416 (quoting *Allison*, 151

F.3d at 415).  "Additional hearings to resolve 'the disparate merits of each individual's case'

should be unnecessary."  *Id.* at 416 (quoting *Allison*, 151 F.3d at 415).  "The operational

meaning of 'incidental' damages in this setting is that the computation of damages is mechanical, 'without the need for individual calculation,' so that a separate damages suit by individual class members would be a waste of resources." *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005) (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.221 (2004)).

A court should consider three factors in determining whether damages are "incidental" for the purpose of Rule 23(b)(2) certification: (1) whether such damages are of a kind to which class members would be automatically entitled; (2) whether such damages can be computed by "objective standards," and not standards reliant upon "the intangible, subjective differences of each class member's circumstances"; and (3) whether such damages would require additional hearings to determine. *Allison*, 151 F.3d at 415.

In the present case, plaintiffs continue to seek punitive damages on a classwide basis for the alleged pattern or practice of discriminatory treatment and the allegedly retaliatory firing of some employees on January 10, 2000.  The Civil Rights Act of 1991 allows plaintiffs to recover punitive damages if an employer discriminated with "malice or reckless indifference" to the protected rights of an individual. 42 U.S.C. § 1981a(b)(1)(2).  Plaintiffs' trial plan proposes that in Stage I, they will try classwide liability and classwide injunctive and declaratory relief and punitive damages.  (Docket Entry No. 81 at 22–23).  They propose that the jury would determine the "aggregate amount of lost earnings owed to the class and a measurement of front pay" during this first stage.  (*Id.* at 28).  Plaintiffs propose that, if they prevail in Stage I, individual equitable relief—the amount of back pay that each plaintiff

receives— would be determined by the court in stage II.  (*Id.* at 23, 29).

The punitive damages plaintiffs seek are not "incidental" to their requested equitable relief.   In *Allison*, the court assumed—with reservations—that punitive damages could be awarded on a classwide basis without individualized proof of injury, but emphasized that such damages would be limited to claims that an entire class or subclass was subjected to the same discriminatory act or series of acts.  151 F.3d at 417. In *Allison*, the court found that unless the evidence is that "each plaintiff was affected by these policies and practices in the same way," certification is inappropriate.  *Id.*

Under this standard, there are two problems with the plaintiffs' request to certify both equitable and punitive damages claims under Rule 23(b)(2).  First, *Allison* held that punitive damages cannot be assessed without proof of liability to individual class members.  Second, punitive damages require proof that each plaintiff was affected by the challenged policies and practices in the same way, a problem in a case involving such a lengthy proposed class period in which the challenged policies and practices themselves changed over time and were imposed differently on different people.

"Punitive damages cannot be assessed merely upon finding that the defendant engaged in a pattern or practice of discrimination.  Such a finding establishes only that there has been general harm to the group and that injunctive relief is appropriate." *Allison*, 151 F.3d at 417. *Allison* made clear that recovery of punitive damages, which must be reasonably related to the "reprehensibility of the defendant's conduct and to the compensatory damages awarded to the plaintiffs," must "necessarily turn on the recovery of compensatory damages."  *Id*. at

56

418.  Punitive damages have to be determined after proof of liability to individual plaintiffs

at the second stage of a pattern or practice case.  *Id*.  Plaintiffs themselves have

acknowledged that compensatory damages are not incidental by withdrawing their effort to

obtain class certification for such damages.   "[P]unitive damages are also non-

incidental—requiring proof of how discrimination was inflicted on each plaintiff, introducing

new and substantial legal and factual issues, and not being capable of computation by

reference to objective standards."  *Id*.

The plaintiffs cite the district court decision in *In re Simon(II) Litigation*, 211 F.R.D.

86 (S.D.N.Y. 2000), for the proposition that classwide punitive damages could be determined

before determining liability to individual class members.  That case was reversed on appeal.

407 F.3d 125 (2d Cir. 2005).  Although the specific basis for the class certification order and

its reversal are not involved in the present case, the appellate court did discuss the general

proposition that classwide punitive damages could be determined before compensatory

damages:

> While our holding in this case rests exclusively on the
> conclusion that certification is incompatible with *Ortiz*, we have
> an additional concern that warrants some discussion. It seems
> that a punitive award under the circumstances articulated in the
> Certification Order is likely to run afoul of the Supreme Court's
> admonitions in *State Farm*, a decision handed down several
> months after the Certification Order issued.  In certifying a class
> that seeks an assessment of punitive damages prior to an actual
> determination and award of compensatory damages, the district
> court's Certification Order would fail to ensure that a jury will
> be able to assess an award that, in the first instance, will bear a
> sufficient nexus to the actual and potential harm to the plaintiff
> class, and that will be reasonable and proportionate to those
> harms.

407 F.3d at 138 (citations omitted). The court cited *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424–25 (2003), which held that "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.[11]

Second, and independently, the claim for classwide punitive damages is inappropriate under *Allison* because plaintiffs do not contend the policies and practices they challenge affected each plaintiff in the same way. Although this case does not have all the variations that were present in *Allison*, because it is a smaller class and is limited to a single facility, some of the problems that prevented class certification in *Allison* exist in this case as well. Here, as in *Allison*, the class period extends over a long period and the evidence shows that the many of the challenged practices have changed over time. The evidence also shows that some individuals had different experiences under those practices. When the evidence shows that plaintiffs suffered differently under the alleged discriminatory practices, classwide punitive damages are inappropriate. *Allison*, 151 F.3d at 417.

The Department 911 jobs represented in the proposed class—forklift drivers, machine operators, and baggers—are distinct from one another and have changed with the passage of time. (*Compare* Docket No. 194, Ex. 15 *with* Docket No. 194, Ex. 16 (showing the jobs in

_____

[11]   The Fifth Circuit allows a punitive damages award without compensatory damages in "cases w[h]ere a violation of a constitutional right has occurred." *Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 303 (5th Cir. 2000); *Lincoln v. Case*, 340 F.3d 283 (2003). A violation of Title VII may, but does not necessarily, violate a constitutional right. *See Maynard v. Price Realty Co.*, 102 Fed. Appx. 854 at *1 (5th Cir. 2004).   But an award of punitive damages in a Title VII case requires the same individualized inquiry necessary for an award of compensatory damages, which defeats its status as  incidental to equitable relief for the purpose of Rule 23(b)(2) certification.

2000 and in 2004, after defendants had implemented significant automation); *see also* Docket Entry No. 81 at 11 (noting that "[b]efore the recent partial mechanization of work in Department 911" the jobs in Department 911 were more physically demanding than those in Department 910)).  Proposed class representative Lazaro Garcia admitted that those who began work after January 2000 never had to clean the bathroom or lunchroom, unlike those employed before that date.  (Tr. T. I at 54, ll. 17–21).  The language requirement changed over time; earlier job postings required applicants to speak English while later postings required applicants to be able to communicate with supervisors, and Spanish-speaking supervisors were later hired in some of the Department 910 shifts, although the evidence as to whether that was consistently applied or communicated to the plaintiffs is inconsistent. (Docket Entry No. 202, Ex. J-1; Ex. I-2 at 104–06).  Many of the proposed class members did not satisfy QuietFlex's eligibility standards for transferring between departments because they had not met the prerequisites of working at QuietFlex for six continuous months, having no final disciplinary warning, and having no transfer within the past six months.  (Docket Entry No. 116, Ex. 16 at 83).  Almost half of the proposed class worked at QuietFlex for four weeks or less.  (Docket Entry No. 116, Ex. 26).  Some of the class members concede that they did not want to transfer, noting that they did not want to work a third or second shift in Department 910 as opposed to a first-shift job in Department 911 or 906.  (*See, e.g.*, *Id.*, Ex. 30 at 63).  Some speak English.  (*See, e.g.*, *Id.*, Ex. 11 at 8).  Some of the putative class members did transfer into Department 910.  (Docket Entry No. 116 at 27).  Some of the putative class members received promotions to supervisory positions.  (*Id.*, Ex. 27 at 47).

Plaintiffs' best argument that the punitive damages claim is susceptible to classwide proof is for the single incident of the allegedly retaliatory firing of some employees on January 10, 2000. As to this subclass, however, injunctive relief does not predominate for (b)(2) purposes. The employees were rehired after two weeks, making injunctive relief inappropriate. The claim for punitive damages predominates. Plaintiffs' claim for classwide punitive damages makes certification under Rule 23(b)(2) inappropriate.

The plaintiffs did not seek class certification under Rule 26(b)(2) limited to claims for injunctive and declaratory relief and back pay. Back pay is an equitable remedy for Rule 23(b)(2) purposes; it is not monetary relief analyzed under an incidental damages standard. *Allison*, 151 F.3d at 414. In *Allison,* the court followed *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 257 (5th Cir. 1974), and held that "back pay could be sought in a (b)(2) class action because, as an equitable remedy similar to other forms of affirmative relief permitted in (b)(2) class actions, it was an integral component of Title VII's 'make whole' remedial scheme." 151 F.3d at 415. In *Monumental Life* the Fifth Circuit explained the role of back pay in a (b)(2) class:

> Equitable monetary relief is compatible with a rule 23(b)(2) class. Importantly, this pronouncement has been limited to the context of title VII backpay, a remedy designated by statute as "equitable." Backpay is therefore unique in that it is "an integral component of Title VII's 'make whole' remedial scheme." Not coincidentally, as compared to compensatory damages, "calculation of back pay generally involves less complicated factual determinations and fewer individual issues." In *Allison*, 151 F.3d at 415, we recognized that, for this reason, backpay generally does not predominate over injunctive or declaratory relief.

60

365 F.3d at 418 (citations omitted).  The court continued: "equitable monetary remedies are less likely to predominate over a class's claim for injunctive relief, but this has more to do with the uniform character of the relief rather than with its label." *Id.*

In this case, because workers in Departments 910 and 911 received piece work pay, their compensation in a given period varied according to the individual employee's productivity, which itself varied depending on the task they were assigned.  Generally, those who produced more pieces—because of ability, experience, or motivation—made more money; those who produced fewer pieces made less.  Defendants assert that there are significant variations among the individual class members' productivity and among an individual's productivity from week to week, depending on the job assigned, which defeat classwide certification of the back pay award.  Plaintiffs assert that if, as they claim, there are no valid differences in skill or work between the tasks in Department 911 and in Department 910, back pay can be objectively and mechanically computed simply by increasing a Department 911 worker's pay by the higher rates paid in Department 910.

Both parties submitted expert reports—and supplemental expert reports—addressing whether back pay could be calculated in a way that would make it "incidental" to the other equitable claims. As noted above, the test under (b)(2) is not whether back pay is "incidental" to equitable relief—it is equitable relief. *See Allison*, 151 F.3d at 415.  The *Allison* court held that the district judge erred in analyzing back pay under the incidental monetary damages standard.  *Id.*  Neither party has addressed certification of a (b)(2) class that is limited to an injunction, declaratory relief, and back pay.  As a result, issues important to class

certification have not been addressed, despite the large amount of briefing in the case.

First, the case law is clear that "classwide back pay should be denied only in extraordinary circumstances," and the difficulty of calculation is not a valid reason. *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 699 (8th Cir. 1980) ( "The court's sole rationale, that 'the varieties of employees involved and the variety of factual considerations' prohibited classwide back pay, is clearly insufficient" for denying back pay awards on a class basis.). Second, because under *Allison*, the court rejected treating back pay as "incidental" damages under (b)(2), the argument that back pay is so hard to calculate on a classwide basis that it defeats certification is essentially an argument that common issues do not predominate and the class would be unmanageable. The Fifth Circuit held in *Allison* that under Rule 23(b)(2), a district court is not to consider the predomination of common issues and the manageability of a class action. 151 F.3d at 414 n.4 (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1105 (5th Cir. 1993)). Nor have the parties examined whether the Seventh Amendment would preclude class certification limited to injunctive and declaratory relief and back pay, given *Allison*'s recognition that when, as here, the same employment policies and practices are challenged under both disparate impact and pattern or practice disparate treatment claims, a jury would first have to decide the factual issues common to these claims before the court could consider the merits of the disparate impact claim and whether the plaintiffs are entitled to back pay or other equitable relief. Nor have the parties examined how foregoing punitive damages to obtain class certification might affect Rule 23(a)(4) adequacy of representation.

In short, the class proposed by the plaintiffs cannot be certified under Rule 23(b)(2)

62

because it includes classwide punitive damages determined in an initial phase, and the plaintiffs have not proposed a trial plan, nor explored the Seventh Amendment implications, of limiting class certification to a (b)(2) class seeking only equitable remedies.

### 2. Rule 23(b)(3)

Rule 23(b)(3) permits certification of class actions that meet Rule 23(a) when the court finds that: "(1) that questions common to the class members predominate over questions affecting only individual members and (2) that class resolution is superior to alternative methods of adjudication of the controversy." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 297 (5th Cir. 2003). "'[T]he predominance and superiority requirements are "far more demanding" than is Rule 23(a)(2)'s commonality requirement.'" *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).

To determine predominance, this court must compare the issues common among the class members and the issues individual to them. *See Castano*, 84 F.3d at 745. Although specific issues may be certified for class treatment, "[a] district court cannot manufacture predominance through the nimble use of subdivision (c)(4)." *Id.* The cause of action as a whole must satisfy Rule 23(b)(3)'s predominance requirement. *Id.* Once that requirement is met, Rule 23(c)(4) allows severance of the common issues for a class trial. *Id.* "The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." *Id.*

Class certification under Rule 23(b)(3) cannot extend to the punitive damages claim. As the court clarified in *Allison*, the recovery of punitive damages in Title VII cases requires "individualized and independent proof of injury to, and the means by which discrimination was inflicted upon, each class member." 151 F.3d at 420. These are individual issues that will predominate over questions common to the class as a whole and defeats certification under Rule 23(b)(3). *See Corley v. Energy Tech Holding Co.*, 152 Fed. Appx. 350 (5th Cir. Oct. 13, 2005) (denying class certification under Rule 23(b)(2) or (b)(3) because of the necessity of individualized damage calculations).

The parties have not addressed whether a (b)(3) class could be certified if limited to equitable relief, including back pay. The parties have briefed the manageability problems involved in calculating back pay. Plaintiffs produced Dr. Louis Lanier, an economist. (Docket Entry No. 202, Ex. T). Lanier proposed two ways to calculate backpay on a classwide basis, assuming that class members in Departments 906 and 911 should have been paid at the same rate as workers in Department 910, given the same amount of time spent on the job and same level of productivity. In the first, the effects of regular hours, overtime hours, productivity, and pay period on the gross pay of employees is estimated, and these estimates are applied to employees in Departments 906 and 911 to estimate what they should have been paid, given their actual regular and overtime hours worked, actual productivity, and actual pay periods worked, if they were compensated at the same rate as Department 910 employees. (*Id.* at ¶ 24). In the second, which Lanier argues is the preferred method, the piece rates paid to the workers in Department 911 would be adjusted upward by a percentage

64

that "would make worker pay equivalent across job groups, on average, for the same amount of time worked and the same level of productivity." (*Id.* at ¶ 26).

Lanier recognized that "from any one pay period to the next it is often the case that different products are required to be produced, which carry with them different piece rates and different time requirements that can affect how much an employee is paid." (*Id.* at ¶ 11). He compensated for this variable by specifying "one set of fixed effects for each pay period that is common to all job titles" because he understood—from a conversation with an undisclosed employee of Department 911—that "the workers across different job titles in the 906, 910, and 911 Departments are all similarly affected by the product changes that occur from pay period to pay period, and [ ] the effects of the product changes are effectively simultaneous for all workers (i.e., there is very little lag from one job title or Department to the next)." (*Id.* at 5 n.6). This understanding seems critical to Lanier's methodology but is insufficiently supported by the record. Lanier's report notes that "[i]t will also be necessary to determine which position in the 910 Department is more appropriate for the purposes of comparison." (*Id.* at ¶ 29). It is not clear that each job in Department 911 has an appropriate "comparison" job in Department 910. Lanier's report clarifies that "[f]or the purposes of these regression analyses, all pay periods that showed abnormally low average hourly rates of pay for any given job title, presumably due to a machine shutdown, were eliminated. Individuals on light duty, vacation, and LOA were also eliminated from the analyses." (*Id.*, Appendix C). The problem is that these conditions did exist and must be accounted for in any method that calculates back pay. Finally, Lanier's calculations assume that a top-

producing Department 911 worker would be a top-producing Department 910 worker and

a low-producing Department 911 worker would be a low-producing Department 910 worker.

These assumptions are directly contradicted by the analysis of defendants' expert, Dr. Jones,

of the experiences of employees who did transfer from Department 911 to Department 910.

On March 8, 2005, Dr. Jones submitted a supplemental report, "An Analysis of Pay

Data for Employees Moving from Department 911 to Department 910 during the Period

October 1997 through December 2004." (Docket Entry No. 229, Ex. 5). Jones examined the

experiences of eight employees, seven Hispanic and one Asian. (Docket Entry No. 207, Ex.

A at 2). Jones acknowledged that it is "a small sample on which to explore evidence of

overall patterns in compensation but, nonetheless, captures all such cases." (*Id.*).[12] Four of

the employees moved directly from Department 911 to Department 910; four moved first to

an intermittent Department before transferring to Department 910. (*Id.*). Jones identified

each employee's weekly average hourly incentive rate for the 52 weeks before he left

Department 911 and the 52 weeks after he joined Department 910 and then compared the

two. (*Id.* at 5, ¶ 14). Of the four who transferred directly from Department 910 to

Department 911, one earned substantially less in Department 910, two had no substantial

change, and one earned substantially more in Department 910. (*Id.* at 7, ¶ 23). Of the four

who to moved to Department 910 from an intermittent department, one earned substantially

---

[12] The plaintiffs recognize the small sample available from which conclusions may be drawn about
the relative productivity of an individual in Department 910 and Department 911, but urge that it is a result
of discrimination: before Latino employees at QuietFlex filed charges with the EEOC, "*not one* Latino
employee from Department 911 and *only two* Latino employees from Department 906 were allowed to
transfer to Department 910." (Docket Entry No. 202 at 10) (emphasis in original).

more in 910, one earned substantially less, one earned slightly less, and one "received too few Department 910 pay checks to permit analysis."  (*Id.* at 8, ¶ 29).  "[T]he pay analysis for this group of four employees was also confounded as a result of operating changes, piece rate changes, mechanization changes, etc., having taken place over the extended period of time." (*Id.* at ¶ 30).   Jones concluded from his analysis that "[a]ll of the employees showed substantial week-to-week variation in pay levels.  Both departments showed this variability. Under the piece rate pay system, pay clearly varies as a function of individual productivity, plant production needs, and other factors." (*Id.* at 2).  Plaintiffs argue that there is no reason to believe that an employee paid piece-work rates in Department 911 would work less hard and want to earn less money if given the opportunity to transfer to Department 910.  But Dr. Jones's report indicates that workers who transferred between the departments experienced significant variations in productivity, making the back pay calculations individualized in nature.

As noted, the record discloses variations in the application of the challenged policies and practices that require individualized determinations of the disparate treatment claims. These variations make certification under (b)(3) problematic.  Many of the proposed class members did not satisfy defendants' standards for transferring between Departments, including the eligibility requirement of working at QuietFlex for six continuous months and being free of disciplinary infractions.  (Docket Entry No. 116, Ex. 16 at 83).  Almost half of the proposed class worked at QuietFlex for four weeks or less.  (Docket Entry No. 116, Ex. 26).  The policies themselves have changed over time.  Class members have testified that

67

transfer opportunities and that the treatment of Latinos generally at QuietFlex has improved during the pendency of this case. (Docket Entry No. 169 nn. 7–12).  They have testified that the materials used in Department 911 has improved over time.  (*Id.*).  The safety equipment has allegedly improved.  (*Id.*).  None of the plaintiffs who began working at QuietFlex after January 2000 had to clean the lunchroom or bathroom.  (Docket Entry No. 116 at 27). QuietFlex implemented automation in Department 911 in January 2001 that changed the physical requirements of the jobs and allowed workers in that department to make more money.  (*Id.*, Ex. 4 at 93).  These variations add to the complexity of certifying a disparate treatment claim under (b)(3).

The parties have not examined a (b)(3) class action limited to an injunction, declaratory relief, and back pay.  They have not adequately examined the effect of a classwide back pay award on the (b)(3) predominance and manageability requirements, or whether such requirements can justify denying classwide back pay.  Nor have plaintiffs addressed whether they risk further compromising their ability to provide adequate class representation if they waive claims to punitive damages as a condition to achieving class certification.  Plaintiffs have not proposed a trial plan for a (b)(3) class limited to an injunction and declaratory judgment and back pay, and the parties have not examined the Seventh Amendment implications such a trial plan might present.  They have not addressed whether disparate impact claims should be certified apart from disparate treatment claims, or if that would offend the Seventh Amendment and the superiority and manageability requirements of (b)(3), given the court's holding in *Allison*.

In short, the class proposed by the plaintiffs cannot be certified under Rule 23(b)(3) because it extends to punitive damages on a classwide basis, and the plaintiffs have not proposed an alternative class or trial plan that would meet the (b)(3) requirements.

IV.   **Conclusion**

Defendants' motion for partial summary judgment on the plaintiffs' retaliation claims is denied.

Plaintiffs' motion for summary judgment on the issue of defendants constituting an integrated enterprise, before Goodman's merger with QuietFlex in 2001, is denied.

Plaintiffs' motion for certification of a class under Rule 23 is denied on the present

record.  A status conference is set for **April 14, 2006, at 2:00 p.m.**

SIGNED on March 31, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge